**Norma J. McNEIL, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 04–CF–1233.**

District of Columbia Court of Appeals.

Argued May 23, 2007.

Decided Oct. 4, 2007.

Corinne Beckwith, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief for appellant.

Florence Pan, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney, and Roy W. McLeese III, David B. Goodhand, Kimberley S. Knowles, and Rachel Carlson Lieber, Assistant United States Attorneys, were on the brief for appellee.

Before REID and GLICKMAN, Associate Judges, and PRYOR, Senior Judge.

PRYOR, Senior Judge:

After a jury trial, appellant was convicted of felony murder while armed[1] and other related offenses. In response to evidence that appellant inflicted fatal injuries upon her child, a toddler, appellant asserted the insanity defense. When appellant was arrested shortly after the killing, she chose to remain silent and not answer any questions. During trial, the prosecution presented evidence of appellant's silence and argued the deliberative nature of appellant's behavior to rebut her defense of insanity. Given existing judicial precedent on this question, we agree with appellant that in this instance, where the central issue of the trial was appellant's state of mind at the time of the killing, the admission of evidence of appellant's silence when arrested and allowance of the accompanying argument was constitutional error which was not harmless beyond a reasonable doubt. Appellant is therefore entitled to a new trial.[2]

The evidence at trial focused largely on alternative theories of the insanity defense. At the close of all the evidence the judge instructed the jury regarding traditional concepts of the insanity defense, but declined to allow a second theory of insanity—drug-induced insanity (settled insanity)—to be considered by the jury. Appellant also asserts this ruling was error. Because we remand this case for a new trial where the issue may arise again, we consider and discuss this question.

## I.

### A.

On the evening of November 13, 2001, appellant and her three youngest daughters—a nine-year-old, a six-year-old, and the fifteen-month-old decedent—were at their home in Southeast, Washington when appellant entered the room in which the girls were playing and announced, while holding a knife, that she had to kill the girls "because Satan told her to do it." When appellant attempted to cut the nine year old, that child and the six year old ran out of the house without shoes or coats and called their grandmother, using a friend's telephone. Shortly thereafter, appellant's brother, Lawrence, and his wife Sheik, arrived to pick up the children. The girls got into Lawrence's car, and he saw appellant walking out of the house

---

1. D.C.Code §§ 22–2101, –4502 (2001).

2. Appellant's other contentions of error are unpersuasive.

toward her own car and asked her, "Where is the baby"? Appellant appeared slow and jittery, but did not respond to the question. Appellant instead gestured toward herself and stated in a slow, exaggerated tone of voice, "Come with me." Lawrence and Sheila declined, and appellant entered her car and drove away from the scene.

Appellant's sister-in-law, Sheila, entered the house, discovered the body of appellant's fifteen-month-old child on a bed in an upstairs bedroom, and called the police. The responding police officers located the decedent's body and observed at the same time two bloody knives—one in appellant's bedroom and one in the kitchen—as well as an open Bible on a chair in the living room. The medical examiner concluded that the decedent died from multiple cutting wounds to the neck.[3]

Appellant, meanwhile, drove her car to a neighborhood church and participated in a Bible-study class after receiving food and clothing from church members who described her as "not really responsive" and appearing "distant" and possibly "sick or high." The police located appellant at the church after a brief investigation; she identified herself, asked the officers several times whether she was going to be arrested, and appeared nervous, with her eyes darting from side to side.

Appellant was arrested and transported to a nearby police station, where she was advised of her Miranda[4] rights and indicated she did not wish to answer any questions. She also pleaded with the detective to pray with her and to help her, and stated she did not want to go to jail: she said she was afraid, and did not want to die. A detective, who spent several hours with appellant later testified that she did not appear to be under the influence of drugs at that time.

### B.

At trial, the government presented evidence establishing the circumstances of the death. The defense then presented its case asserting an affirmative defense of insanity. The government presented a rebuttal case asserting that any psychosis appellant may have experienced was the result of voluntary phencyclidine (PCP) intoxication. Finally, the defense presented a surrebuttal case to counter the assertion that appellant had been intoxicated. Ultimately, experts from both sides agreed that at the time of the murder, appellant was in a psychotic state that interfered with her ability to control her actions; the major disagreement was over the cause of the psychosis.

The government's theory was that appellant killed her daughter while in a psychotic state due to PCP intoxication from recent PCP use. In the government's case-in-chief, appellant's sister-in-law testified that when she entered the house and discovered the decedent's body, the house was "very misty, cloudy" with a "chemical" odor like that of "PCP and bleach." In the government's rebuttal case, appellant's

---

**3.** The decedent's autopsy revealed approximately twenty-five incisions to her neck including the fatal wound: a "gaping" incision on the right side of her neck that severed the jugular veins and cut through the cervical vertebrae down to the spinal cord. There were eighteen knife wounds to the decedent's chest and shoulder that were inflicted with a knife tip, with hemorrhaging that indicated that the wounds were inflicted while her

heart was still beating. The decedent also had chemical burns on her face; one of her sisters testified that the decedent drank floor cleaner while appellant was out of the room, and cleaning solution was found in a cup in appellant's bedroom.

**4.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

neighbor, Antonio, testified that he smoked PCP with appellant "about two weeks" before the decedent's death, as he had on a previous occasion about five or five-and-a-half months before the death. Statements of appellant's boyfriend, Tyrone, were admitted without objection, revealing that appellant bought a $500 vial of PCP in late September or early October and that appellant had been "regularly using, regularly dipping" at that time. A forensic toxicologist, Dr. Fiona Couper, explained that the effects of PCP can last longer than the period in which PCP can be detected in one's blood.

The primary defense theory was that appellant suffered from a mental illness unrelated to her PCP use that met the legal standard for insanity. In support of this theory, the defense called Dr. Carol Kleinman, a forensic psychiatrist who was qualified as an expert witness.[5] Dr. Kleinman testified that in her professional opinion, appellant was a "severely mentally ill psychotic woman" at the time of the murder and continuing at the time of trial, and that appellant's "psychotic disorder or schizoaffective disorder prevented her from conforming her conduct to the requirements of the law on November 13th, 2001." Although appellant admitted past PCP use, Dr. Kleinman concluded that a mental illness was a better explanation for appellant's conduct and symptoms because: (1) appellant's behavior after the murder was not consistent with the usual signs of PCP intoxication; (2) there was no physical evidence that appellant had used PCP; (3) appellant reported, as did her

children, that she had not used PCP for six to eight weeks before the decedent's death; (4) appellant needed anti-psychotic medication at the jail and continued to need it at the time of trial; (5) appellant's psychosis lasted much longer than it would have lasted had it been caused by PCP; and (6) in Dr. Kleinman's "clinical judgment," appellant was not malingering. Dr. Kleinman testified that neither PCP intoxication ("absolutely not") nor PCP-induced psychosis ("definitely not") could explain the long-term continuation of appellant's symptoms. Other defense witnesses supported this theory of insanity. A psychiatric nurse, Margo Weaver, and a coordinator of mental health services at the jail, Janna McCargo, each testified, based on their experience with PCP users and observations of appellant shortly after the decedent's death and at various points over the next several months, that they believed appellant had an ongoing mental illness unrelated to PCP. Appellant's family members testified about appellant's unusual behavior in the months preceding the decedent's death.

The government also presented expert testimony about appellant's mental condition. Dr. Stephen Lally, a clinical psychologist, testified that appellant was in an "altered state due to her use of PCP" that caused her actions on the day of the decedent's death.[6] Dr. Lally testified that acute PCP intoxication can last several days to a week after use; that a PCP-induced psychotic disorder, or "toxic psychosis," affects one in five PCP users and

---

5. Dr. Kleinman first examined appellant on November 22, 2001, nine days after the decedent's death, and met with appellant four more times before trial for a total of over six hours. Dr. Kleinman also reviewed appellant's medical records, police files, and the Diagnostic & Statistical Manual's description of PCP intoxication, and spoke with the police

and appellant's family members, friends, and medical providers.

6. Dr. Lally met with appellant at the Correctional Treatment Facility on two occasions— March 4 and March 11, 2003—for a total of approximately six-and-a-half hours, more than a year after the decedent's death on November 13, 2001.

can last up to a month after use; and that a longer period of psychosis is "less likely" but "possible." In Dr. Lally's expert opinion, appellant was intoxicated and acting under the influence of PCP when she killed her infant daughter.

Dr. Raymond Patterson, a forensic psychiatrist, testified that he believed appellant was intoxicated on PCP when she killed her daughter because: (1) appellant admitted using PCP in September 2001 and other witnesses reported her use "more proximal" to the decedent's death; (2) appellant had not required psychiatric treatment since her prior psychotic episode in 1985, which was triggered by PCP use; (3) appellant's symptoms appeared to begin to decline at the church and the jail and dissipated after a couple of days, whereas a PCP-induced disorder could last up to a month or more; (4) no psychosis was noted during appellant's medical appointment three weeks before the decedent's death; and (5) some staff members at St. Elizabeths concluded that appellant was malingering several months after the death.[7] On cross-examination, Dr. Patterson acknowledged that if there was no credible evidence that appellant smoked PCP within a couple of weeks before the murder, then there was a possibility that appellant was suffering from a PCP-induced psychotic disorder rather than intoxication.

Out of the jury's presence, the defense proffered an alternative theory of the case: that appellant was suffering from the effects of a PCP-induced psychotic disorder that outlasted the period of customary PCP intoxication and rose to the level of legal insanity. Although this theory was raised to the court before trial began, the defense presented no expert evidence to support this theory, relying instead on the information that the defense anticipated could be elicited from the prosecution witnesses. The trial judge gave a preliminary instruction to the jury on the theory of settled insanity alongside the instruction on intoxication. However, after several discussions with counsel, the judge ultimately concluded that the theory of settled insanity was not supported by sufficient evidence and refused to instruct the jury as to this theory in the final instructions. Appellant was convicted of five of the seven indicted counts and timely noted this appeal.[8]

## II.

While this case raises new questions relating to the insanity defense, appellant's contentions premised on her *Miranda*[9] protections are straight forward. Relying expressly on the Supreme Court's decision in *Wainwright v. Greenfield,* 474 U.S. 284, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986), appellant urges that the trial judge committed reversible error by permitting the government, over objection, to introduce evidence and to argue that appellant, shortly after arrest, was lucid and clear—headed, when she—after being warned of her rights-chose to remain silent.

### A.

■ After her arrest, appellant was taken to a nearby police station where she

---

7. Dr. Patterson met with appellant on three occasions—April 23, May 10, and June 3, 2002—for a total of approximately three hours. Dr. Patterson also reviewed appellant's medical records and Dr. Lally's report on appellant.

8. The government before trial dismissed a count that alleged first-degree premeditated

murder while armed, and the trial court granted the defense motion for judgment of acquittal on a second count of first-degree child cruelty (based on the decedent drinking floor cleaner) without opposition from the government.

9. *See Miranda v. Arizona, supra,* 384 U.S. at 436, 86 S.Ct. 1602.

was interviewed by Detectives George Taylor and Stephanie Ellison. During this interview, in which appellant was described as concentrating and attentive, she was presented with Police Department Form 47 ("PD–47")—also known as a "rights card." A *Miranda* warning was printed on one side of the card, and on the other side were the word "WAIVER" and four questions:

1.  Have you read or had read to you the warning as to your rights?
2.  Do you understand these rights?
3.  Do you wish to answer any questions?
4.  Are you willing to answer questions without having an attorney present?

On the blank lines next to the first two questions, appellant wrote "yes," indicating that she had read and understood her rights. She wrote "no" next to the third question, indicating that she did not wish to answer questions, and wrote nothing next to the final question.[10]

At trial, the government moved in its case-in-chief the admission of the rights card for its relevance to appellant's state of mind shortly after the offense—specifically, to show how appellant was functioning, how rational she was, and that she was "coming down from intoxication" rather than suffering from a legitimate mental illness. As the government explained in a bench conference:

> To be very clear, ... [appellant was] in a PCP-induced state, and ... the government's evidence will show that [a] PCP-induced state could wax and wane. There are moments of lucidity. You know exactly what is going on and moments you are off your rocker. The government is going to argue ... *this is the critical example* of her shortly after

the murder being, I guess, waning, as opposed to waxing.

Defense counsel objected. After this evidence was admitted, several other references were made to appellant's invocation of her *Miranda* rights by lay and expert witnesses. In closing argument, the government invited the jury to infer appellant's sanity from her invocation of her *Miranda* rights, arguing that appellant became "more and more lucid" over the period of time she spent with Detectives Taylor and Ellison. The government stated in summation

. . . .

> And significantly, ladies and gentlemen, even after she told Detective Taylor I don't want to talk about this because I don't have a lawyer present, she couldn't help herself, could she. She couldn't help herself. She asked question after question related to what was going on in her criminal case. How much time can I get. Are you going to charge me with murder. Have you talked to my kid yet. That's because, ladies and gentlemen, she knew at that point that she had killed her daughter, Aniya. She knew she was in a whole heap of trouble because she knew it was wrong.

### B.

We agree with appellant's assertion that the admission of the rights card was constitutional error and was not harmless. In *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the Supreme Court held that evidence of a defendant's post-arrest, post-*Miranda* warning silence was inadmissible even for impeachment purposes because such silence "is insolubly ambiguous" in light of the implied assur-

---

10.  The card also bore appellant's signature and initials, the signatures of two police de-
tectives, and the date and time the card was completed.

ance within the *Miranda* warning "that silence will carry no penalty." 426 U.S. at 617–18, 96 S.Ct. 2240. "In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Id.* at 618, 96 S.Ct. 2240; *see also Alexander v. United States*, 718 A.2d 137, 141 (D.C.1998) ("It is axiomatic that no inculpatory inference can be drawn from an arrestee's decision to stay silent following *Miranda* warnings.").

■ Subsequently in *Wainwright, supra*, 474 U.S. at 291–92, 106 S.Ct. 634, the Supreme Court clarified that even when the evidence may show state of mind relevant to a claim of insanity, due process is violated when evidentiary use is made of an individual's exercise of her constitutional rights after the government's implicit assurance that the invocation of those rights will not be penalized.[11] Citing *Doyle*, the Court explained:

> [I]t is fundamentally unfair to promise an arrested person that his silence will not be used against him and therefore to breach that promise by using the silence to impeach his trial testimony. It is equally unfair to breach that promise by using silence to overcome a defendant's plea of insanity. In both situations, the [government] gives warnings to protect constitutional rights and implicitly prom-

ises that any exercise of those rights will not be penalized.. In both situations, the [government] then seeks to make use of the defendant's exercise of those rights in obtaining his conviction. The implicit promise, the breach, and the consequent penalty are identical in both situations.

474 U.S. at 292, 106 S.Ct. 634. The Court also clarified that post-*Miranda* "silence does not mean only muteness: it includes the statement of a desire to remain silent, as well as of a desire to remain silent until an attorney has been consulted." *Id.* at 295 n. 13, 106 S.Ct. 634.[12] A number of factors may be relevant to the harm caused by an error, including, for example, the closeness of the case, the centrality of the issue affected by the error, and any steps taken to mitigate the effects of the error. *See, e.g., Freeman v. United States*, 689 A.2d 575, 584 (D.C.1997). The key issue in this case was appellant's mental state in the periods of time surrounding the offense, and the disagreement between the expert witnesses—whether appellant was mentally ill or merely intoxicated— arose from competing views as to when appellant's psychotic symptoms resolved. This case thus involved far more than a passing reference to post-*Miranda* silence, and instead involved the prosecutor's attempt to undermine the primary defense theory.

---

**11.** *Doyle* and *Wainwright* involved the due process clause of the Fourteenth Amendment. Defendants in the District of Columbia receive equivalent protection under the due process clause of the Fifth Amendment. *See Singleton v. United States*, 488 A.2d 1365 (D.C. 1985) (reversing conviction under *Doyle* doctrine); *see also District of Columbia v. Green*, 310 A.2d 848, 855 n. 15 (D.C.1973) (citing *Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954)).

**12.** The Court went on to state in *Wainwright:* "[T]he State's legitimate interest in proving

that the defendant's behavior appeared to be rational at the time of his arrest could have been served by carefully framed questions that avoided any mention of the defendant's exercise of his constitutional rights to remain silent and to consult counsel." 474 U.S. at 295, 106 S.Ct. 634 (footnote omitted). We express no opinion on whether, at any retrial of this case, statements or questions posed by appellant following her assertion of her right to remain silent would be admissible in this matter.

Appellant's insanity defense was not frivolous, and credible evidence was presented on both sides of the issue. Under the circumstances, we cannot conclude beyond a reasonable doubt that the jury still would have rejected appellant's insanity defense had the evidence that she invoked her *Miranda* rights not been introduced. Accordingly, we conclude there was error, which was not harmless beyond a reasonable doubt.

## III.

■ For many years, legal writers and courts have drawn a distinction between the defenses of intoxication and insanity. The former, at best, can be a partial defense. However, where the proof supports the theory, insanity can be a complete defense. This case raises a narrower question which stems from the illicit use of drugs and chemicals; broadly stated, we consider where the defense of voluntary intoxication ends and the insanity defense begins. More specifically, we address the rationale and limits of recognizing drug-induced insanity, sometimes referred to as "settled insanity." Given the wide range of circumstances giving rise to these questions, it is not surprising that courts and commentators are not unanimous in resolving them. At the heart of the legal analysis is the premise that a person may not voluntarily become intoxicated and use that condition, generally, as a defense to criminal behavior. Where one voluntarily ingests drugs or chemicals, over an extended period, which creates a drug-induced mental disability or

disorder, the inquiry is presented, whether, and to what extent, legal responsibility should be excused. Thus, when compared to the traditional insanity defense, "settled insanity"—an evolving concept—refers to a residual psychosis attributable to the long term effects of alcohol or substance abuse which can cause the accused to be deemed legally insane.

### A.

### *The Traditional Insanity Defense*

■ In the District of Columbia, we have accepted the premise "that an individual may be excused from the standards of conduct demanded by society of its members by reason of psychiatric abnormality." *Bethea v. United States*, 365 A.2d 64, 72 (D.C.1976), *cert. denied*, 433 U.S. 911, 97 S.Ct. 2979, 53 L.Ed.2d 1095 (1977). In the current iteration of what has been an evolving definition of legal insanity:

> A person is not responsible for criminal conduct if at the time of such conduct as a result of a mental disease or defect [s]he lacked substantial capacity either to recognize the wrongfulness of [her] conduct or to conform [her] conduct to the requirements of law.

*Id.* at 70 n. 9; *Patton v. United States*, 782 A.2d 305, 311–12 (D.C.2001). As used in this definition, "[a] mental disease or defect includes any abnormal condition of the mind which substantially affects mental or emotional processes and substantially impairs behavior controls."[13] *Bethea, supra,* 365 A.2d at 74, 81 ("specifically retain[ing]" the definition announced in *McDonald v.*

---

**13.** "The term 'disease' is used 'in the sense of a condition which is considered capable of either improving or deteriorating,' while the term 'defect' is used 'in the sense of a condition which is not considered capable of either improving or deteriorating and which may be either congenital, or the result of injury, or the residual effect of a physical or mental

disease.'" *Bethea, supra,* 365 A.2d at 74 n. 20 (quoting *Durham v. United States*, 94 U.S.App. D.C. 228, 241, 214 F.2d 862, 875 (1954)). In *Bethea,* however, we observed that this distinction between mental disease and defect is of limited assistance because it over-compartmentalizes the two concepts. *Id.*

*United States,* 114 U.S.App. D.C. 120, 312 F.2d 847 (1962) (*en banc* )). However, "the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct." *Id.* at 79.

■ As our cases have explained, the insanity defense "arises from our heritage of fundamental moral precepts which condition responsibility (*i.e.,* accountability) for one's behavior on the existence of an effective choice of conduct." *Id.* at 72. The controlling premise of our system of criminal law is that a person who commits a crime is "a free agent confronted with a choice between doing right and doing wrong and choosing freely to do wrong." *Carter v. United States,* 102 U.S.App. D.C. 227, 235, 252 F.2d 608, 616 (1957) (citations omitted). "An insane man is not held responsible, because he has not a criminal mind in respect to the act he committed." *Id.* Moreover, "society has recognized over the years that none of the three asserted purposes of the criminal law—rehabilitation, deterrence and retribution—is satisfied when the truly irresponsible, those who lack substantial capacity to control their actions, are punished." *Bethea, supra,* 365 A.2d at 72 n. 16 (quoting *United States v. Freeman,* 357 F.2d 606, 615 (2d Cir.1966)).

■ When the insanity defense is implicated, however, "the rules by which we apply the principles of responsibility must serve simultaneously the legitimate concerns of the community for its security and the proper administration of its crimi-

nal justice system as well as the interests of the individual defendant. [Doctrines of exculpation] involve a moral choice by the community to withhold a finding of responsibility and its consequence of punishment." *Bethea, supra,* 365 A.2d at 90 n. 55. "Where the interests of the individual conflict with those of society, the security of the community must be considered the paramount objective." *Id.*

■ Accordingly, every person is presumed sane and "equally capable of the same forms and degrees of intent." *See Bethea, supra,* 365 A.2d at 87; *United States v. Tyler,* 376 A.2d 798, 805 (D.C. 1977). A criminal defendant bears the burden of affirmatively establishing his or her insanity by a preponderance of the evidence. *See* D.C.Code § 24–501(j) (2001); *Patton, supra,* 782 A.2d at 311–12; *Pegues v. United States,* 415 A.2d 1374, 1378 (D.C.1980).[14] A defendant thus must present a *prima facie* case of insanity before he or she can survive a government request for a directed verdict on the issue and have the issue placed before the jury. *Pegues, supra,* 415 A.2d at 1377 n. 7 (citing *Cooper v. United States,* 368 A.2d 554, 559–60 (D.C.1977)).[15] *Prima facie* evidence is "[e]vidence that will establish a fact or sustain a judgment unless contradictory evidence is produced." BLACK'S LAW DICTIONARY 598 (8th ed.2004); *see also White v. Commonwealth,* 272 Va. 619, 636 S.E.2d 353, 357 (2006); *Johnson v. California,* 545 U.S. 162, 170, 125 S.Ct. 2410, 162 L.Ed.2d 129 (2005). "To establish a *prima facie* case of insanity, the defendant must

**14.** This affirmative burden does not violate Due Process. *Bethea, supra,* 365 A.2d at 95.

**15.** The requirement that a defendant present *prima facie* evidence of insanity before receiving an instruction on the affirmative defense—which negates criminal culpability for guilty conduct—is distinguishable from the rule applied to a "theory of the case that

negates ... guilt of the crime charged," in which instance a defendant is entitled to a requested jury instruction whenever "that instruction is supported by any evidence, however weak." *See Higgenbottom v. United States,* 923 A.2d 891, 899 (D.C.2007) (quoting *Gray v. United States,* 549 A.2d 347, 349 (D.C. 1988)).

present sufficient evidence to show that, at the time of the criminal conduct, as a result of a mental illness or defect, he lacked substantial capacity to recognize the wrongfulness of his act or to conform his conduct to the requirements of the law." *Pegues, supra,* 415 A.2d at 1378. In sum, an accused must satisfy this standard of proof in order to warrant an instruction to the jury regarding the insanity defense.

## B.

### *Distinguishing Insanity from Intoxication*

In *Bethea,* we described a "mental disease or defect" as "any abnormal condition of the mind which substantially affects mental or emotional processes and substantially impairs behavior controls." 365 A.2d at 74, 81. This broad definition is designed to encompass insanity arising from many different causes. *See id.* at 88 n. 52. However, when drug or alcohol abuse is proffered as the basis for the mental disease or defect, there is significant tension between the insanity defense and the universally-accepted tenet that voluntary intoxication does not excuse criminal behavior.

■ "No rule is more firmly established than that voluntary drunkenness is no defense for a criminal act, unless specific intent or knowledge is an element of the offense, when drunkenness may be shown to prove mental incapacity to form the specific intent." *Proctor v. United States,* 85 U.S.App. D.C. 341, 342, 177 F.2d 656, 657 (1949); *see also Montana v. Egelhoff,* 518 U.S. 37, 44, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996) ("Th[e] stern rejection of inebriation as a defense became a fixture of early American law . . . .").

Although insanity and intoxication may result in similar mental conditions, albeit with disparate durations, the rationale for distinguishing between insanity and intoxication is sound. As one court explained:

Though it is a general rule that insanity is an excuse of crime, there is one exception to the rule, and that is, where the crime is committed by a party in a fit of recent intoxication, though the party is bereft of his reason by drunkenness, and therefore is insane as from any other cause. All authorities recognize drunkenness to be a species of insanity that may be attended, when carried far enough, with loss of reason and self-control, while under the direct effects of the intoxicant; but this effect is voluntary, and brought about by the acts of the party, and thereby differs from ordinary insanity, which is the act of Providence, and the sufferer is not responsible.

. . . .

There is no difference between the two kinds of insanity [*i.e.,* settled insanity and temporary insanity resulting from recent intoxication] so far as the mental *status* is concerned, but they differ widely in their causes and results. The first is from drinking as a *remote* result; the second from drinking as a *direct* result. The first is an involuntary result, from which all shrink alike; the second is voluntarily sought after. In the first, there is no criminal responsibility; but in the second, responsibility never ceases.

*Evers v. State,* 31 Tex.Crim. 318, 20 S.W. 744, 747 (1892); *see also State v. Sexton,* 180 Vt. 34, 904 A.2d 1092, 1111 (2006).[16]

## C.

### *The Settled Insanity Defense*

Although the concept of "settled insanity" has won some acceptance in the United

---

**16.** Appellant raised neither voluntary nor in- voluntary intoxication as a defense.

States,[17] we have not resolved the question in the District of Columbia. In this jurisdiction the first suggested approval of a settled insanity defense was declared in *Harris v. United States*, 8 App. D.C. 20 (1896), in which a defendant charged with murder claimed that voluntary alcohol intoxication should excuse or at least reduce the charge. In affirming the trial court's refusal to admit evidence in support of an insanity defense, the court quoted an opinion from the New York Court of Appeals:

> It is a duty which every one owes to his fellowmen and to society, to say nothing of more solemn obligations, to preserve, so far as it lies in his own power, the inestimable gift of reason. *If it is perverted or destroyed by fixed disease, though brought on by his own vices, the law holds him not accountable.* But if by a voluntary act he temporarily casts off the restraints of reason and conscience, no wrong is done to him if he is considered answerable for any injury which in that state he may do to others or to society.

*Id.* at 28–29 (emphasis added). Later, this court in *Easter v. District of Columbia*, rejected the appellant's claim that his chronic alcoholism should excuse his offense of public intoxication, observing that the defendant asserted only that his alcoholism and not that any form of insanity vitiated his criminal responsibility. 209 A.2d 625, 627 (D.C.1965) (*Easter I* ), *rev'd*, 124 U.S.App. D.C. 33, 361 F.2d 50 (1966) (*en banc* ) (*Easter II* ). In dictum, we again noted approval of a settled insanity defense: "Extended habits of intemper-

ance which produce mental disease amounting to insanity relieve an accused of responsibility under the law. Insanity of this type is identical in law with insanity arising from other causes." *Id.* (citing *Harris*, 8 App. D.C. at 28).

In *Barrett v. United States*, 377 A.2d 62 (D.C.1977), this court reviewed and rejected an appellant's claim that he should have been allowed to introduce evidence at trial of his insanity due to "drug-induced toxic psychosis." We observed that "the critical question . . . . is the *availability* of the insanity defense given the evidence of [the appellant's] *voluntary* taking of drugs which produced the 'toxic psychosis.' " 377 A.2d at 64. We stated that "temporary insanity created by *voluntary* use of intoxicants will not relieve a defendant of criminal responsibility even if that mental condition would otherwise meet the applicable legal definition of insanity." *Id.* at 63–64 (footnote omitted). Finally, we note that in *Phenis v. United States*, 909 A.2d 138, 157–59 (D.C.2006), this court recognized, *in dictum*, the potential viability of a claim of insanity based on a "PCP-induced psychosis."

■ Taking into account the evolving knowledge of the legal and medical professions, the complexity of the subject, and the infinite number of ways in which this problem can and does arise, the judicial response has been varied. One approach, which reflects the influence of the traditional insanity defense, requires prolonged and chronic use of an intoxicating substance causing a mental illness of a fixed

---

17. *See, e.g., White, supra*, 636 S.E.2d at 357 (collecting cases that recognize a settled insanity defense); *People v. Free*, 94 Ill.2d 378, 69 Ill.Dec. 1, 447 N.E.2d 218, 232 (1983) (same); *see also* 22 C.J.S. *Criminal Law* § 147, at 201 (2006) ("[I]f mania or insanity, although caused by the use of a drug, is permanent and fixed in character, so as to destroy the knowledge of right and wrong as to the act, the person laboring under such infirmity will not be responsible."); 2 CHARLES E. TORCIA, WHARTON'S CRIMINAL LAW § 112, at 123 (15th ed.1994).

or permanent nature.[18] Other jurisdictions have fashioned a more expansive approach. Namely, that a mental illness or disease caused by drug abuse, even if temporary in nature, may nonetheless be deemed legal insanity, if not limited to periods of intoxication. See cases cited *infra.* Under both approaches the person claiming the defense must demonstrate that as a consequence of the mental condition, the accused could not appreciate or conform to the requirements of the law.

## D.

### Discussion

Appellant requested instructions to the jury on all of the alternate theories of the insanity defense. The trial judge granted the request with respect to what we have described as the traditional insanity defense; the jury rendered a verdict adverse to appellant on that question. However, after multiple bench conferences regarding settled insanity, the judge found the evidence insufficient to submit an alternate theory of insanity to the jury and declined to do so. This ruling is, of course, the crux of appellant's challenge and the basis for the claim of error. Stated succinctly, appellant argues that viewing all of the evidence that was provided by the prosecution and defense, that the jury should have been permitted to consider the question of PCP-induced settled insanity.

There was considerable evidence from lay witnesses, appellant's prior statements, health professionals, and medical records that appellant used PCP sporadically. Dr. Lally and Dr. Patterson (government witnesses) testified from appellant's medical records that she was hospitalized at age fifteen after using PCP. Doctors Lally, Patterson, and Kleinman testified that appellant told them she previously had used PCP but stopped approximately two months before she killed her daughter. Appellant's neighbor testified that he used PCP with appellant twice in the few months before the decedent's death. Appellant's sister-in-law testified that she smelled the odor of PCP in appellant's house on the day of the killing and on one previous occasion. Dr. Lally testified that appellant's boyfriend, Tyrone, had stated that appellant was "regularly using, regularly dipping" during a period of time in late September or October 2001.

Dr. Kleinman, a witness for the defense, stated her opinion that appellant suffered from a traditionally-recognized mental illness—a "psychotic disorder or schizoaffective disorder"—and indeed was psychotic at the time of the killing. Significantly, Dr. Kleinman concluded that appellant's condition was not induced by drugs. Dr. Patterson and Dr. Lally, while agreeing that appellant was psychotic, did not agree with Dr. Kleinman's traditional-insanity explanation for that condition; rather, they concluded that appellant's psychosis at the time of the killing was the result of intoxication. Although both government doctors acknowledged on cross-examination that PCP can cause a persistent psychotic condition beyond the period of acute intoxication, they did not opine that appellant suffered from that condition. Indeed, appellant did not offer the testimony of any witness (presumably an expert) who concluded that appellant in fact had a PCP-

---

**18.** However, to find that drug use caused a mental disease or defect other than mere intoxication requires a precise understanding of the drug's physiological effect on the body and the mechanism by which drug use can have lasting effects or even cause insanity.

These are not matters within the ken of the average layperson, and accordingly scientific or medical expert testimony on this issue is necessary to sustain the defense. *See In re B.L.,* 824 A.2d 954 (D.C.2003).

induced mental disease or defect distinguishable from intoxication.

Dr. Patterson testified that PCP can be "stored in fat and to some extent in muscle.... [I]f you then have an increase of psychomotor activity, you're punching, you're kicking, you're doing something, your muscles and your fat are being stimulated. So if there's stored PCP in there, there's a greater likelihood it's about to get excreted back into your blood, back to your brain, and you start acting crazy again." [04/12/04 Tr. 42] Similarly, Dr. Lally explained:

> [T]he way PCP is metabolized, ... it actually clears out of the body and is stored in the fat, which is part of why you can see the effects of PCP for a long period of time. It can get released from the fat. And sometimes people talk about a PCP flash back. But what they are really talking about is actually the PCP being released from the fat, and individuals, again, having some psychotic symptoms after the fact.... The other explanation of why somebody might still be having it, would be PCP induced psychotic disorder. For some individuals when they have PCP, they are intoxicated. And after the intoxication wears off, they are okay. But for a certain percentage of folks, and it is about one out of five, what you expect to see is what is called a toxic psychosis. Basically, you are seeing psychotic symptoms that are secondary to the use of PCP. And they can last for days, weeks, even up to a month.

### 1.

■ It is fair to state that appellant, a young adult woman, used PCP, sporadically, since she was a teenager. It is less clear when she ingested the substance immediately prior to the child's death. Under the view of the doctrine requiring extended use and a disease of a permanent nature, it was critical to the defense that appellant muster the required evidence to show that she had—at the time of the crime—ingested PCP for a long and extended period of time, which caused her to have a condition of mental illness which manifested itself in a psychotic condition—not simply intoxication—of a permanent nature. As in any insanity defense, she needed to show that, as a result of this illness, she was unable to appreciate the criminality of her actions, so as to conform her behavior to lawful requirements. Although government witnesses, in response to broad, hypothetical questions posed during cross-examination, acknowledged that delayed psychotic episodes could sometimes occur weeks after ingestion, beyond a period of usual intoxication, no one concluded that this was appellant's particular condition. Rather the government witnesses deemed her to be no more than intoxicated. Dr. Kleinman, a defense witness, found her to be suffering from a psychotic condition unrelated to drugs.

■ We need not declare the precise elements of this doctrine to conclude that appellant's evidence was deficient to go to the jury. Although there was evidence of extended use of PCP, there was no evidence that appellant was suffering from a drug-induced mental illness at the time of the homicide. She did not present sufficient evidence which, standing alone, would have permitted a jury—without speculation—to accept her defense. Stated simply, there was no *prima facie* evidence of drug-induced insanity. It is important to appreciate that this standard embodies more than an evidentiary rule of procedure. Indeed it reflects the significant and careful thought which the insanity defense evokes, and is an important balance between the right of the individual

and the security concerns of the community.

### 2.

In attempting to demonstrate that appellant's evidence established a *prima facie* defense of settled insanity, appellant urges this court to accept a more expansive view of the settled insanity defense. This approach varies, but accepts within the settled insanity defense temporary mental conditions and conditions arising from recent and sporadic drug use. For example, in *People v. Conrad,* the intermediate appellate court of Michigan concluded that a defendant who used PCP four or five times in the two weeks before committing a murder could invoke a settled insanity defense. 148 Mich.App. 433, 385 N.W.2d 277, 280 (1986). The court held that "a 'settled condition of insanity' caused by drug abuse, even if temporary in nature, may nevertheless be legal insanity if the condition was not limited merely to periods of intoxication." *Id. See also Porreca v. State,* 49 Md.App. 522, 433 A.2d 1204, 1208 (1981). In *People v. Kelly,* 10 Cal.3d 565, 111 Cal.Rptr. 171, 516 P.2d 875, 876–77 (1973), the Supreme Court of California upheld a similar statement of settled insanity. See also *State v. Smith,* 260 Or. 349, 490 P.2d 1262, 1264 (1971) (recognizing a settled insanity defense where use of intoxicants were deemed to produce insanity, either "permanent or intermittent," at the time of the offense); *Kiley v. State,* 860 So.2d 509, 511 n. 3 (Fla.Dist.Ct.App.2003) (same).

■ Our *Barrett* decision and our other cases, read together, can be understood as rejecting this approach. We agree with the Vermont Supreme Court that, as a matter of public policy, a narrower track must be taken:

> To retain any moral or legal salience, the [settled insanity] doctrine must—if it is ever justified—be limited to those cases where the initial choice to abuse alcohol or drugs has become so attenuated over time that it serves little or no purpose to hold the defendant accountable for that choice once a permanent mental illness has taken hold through years of chronic substance abuse.

*Sexton, supra,* 904 A.2d at 1103–04 (citation omitted). Accordingly, we do not adopt this broader defense which appellant urges. We are mindful that under the expanded view of the doctrine, the evidence presented in this case would satisfy appellant's obligation to present *prima facie* of drug-induced temporary insanity. However, we reject this approach as a matter of law.

For these reasons, we conclude the trial judge did not err in declining to submit the question of settled insanity to the jury.

### IV.

### SUMMARY

The presentation of evidence and argument by the government that, shortly after arrest, appellant invoked her *Miranda* right to silence, was a violation of her constitutional protection which was error that was not harmless beyond a reasonable doubt. She is therefore entitled to a new trial.

Given the prospect of a new trial, we have taken care to articulate the general boundaries of a drug-induced insanity defense. We reject, as a matter of law, that, without more, drug-induced temporary psychosis will suffice. As to appellant's remaining alternative theory of settled insanity, requiring her to demonstrate a mental disease, beyond intoxication, we conclude the evidence was deficient.

Accordingly, the convictions are reversed and the case is remanded for a new trial.

*So ordered.*