**Ricardo JENNINGS, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 07–CF–711.

District of Columbia Court of Appeals.

Argued March 4, 2010.
Decided April 29, 2010.

---

O. Dean Sanderford, Public Defender Service, with whom James Klein and Corinne Beckwith, Public Defender Service, were on the brief, for appellant.

Peter S. Smith, Assistant United States Attorney, with whom Channing D. Phillips, Acting United States Attorney at the time the brief was filed, and Roy W. McLeese III, Mary B. McCord, and Douglas Klein, Assistant United States Attorneys, were on the brief, for appellee.

Before PRYOR, FERREN, and KING, Senior Judges.

PRYOR, Senior Judge:

Appellant was charged with first-degree premeditated murder while armed, possession of a firearm during a crime of violence, and possession of a prohibited weapon. D.C.Code §§ 22–2101, –4502, –4515(b), (c) (2001). After a jury trial, he was acquitted of first-degree murder but convicted of second-degree murder, as a lesser-included offense, and both weapons charges. He now appeals his conviction on the basis that it was error to instruct the jury on the lesser-included charge based on the evidence presented. We affirm.

## I.

In June 2004, a group of residents in the 1500 block of Second Street, Southwest were congregating outside their apartments to socialize. Around 10:30 p.m., Ernest Jennings, appellant's uncle, knocked over a trash can near the group, spreading garbage and broken glass on the ground. He appeared to be intoxicated and refused to pick up the trash can and debris. An argument ensued between Ernest Jennings and several members of the group, who insisted he clean up the trash. Appellant was at his aunt's apartment nearby when he was called to come get his uncle. After several unsuccessful attempts, appellant convinced his uncle to get into a car and the two drove away.

At about 2:00 a.m. the next morning, a smaller group of individuals continued to socialize in lawn chairs assembled in the courtyard of an apartment building on Second Street. Kelly Hull, the sister of the man who was later killed, was about to leave with her brother, Jamal. He waited for her by his car parked in front of the apartment building. Kelly Hull walked out of the courtyard and around the side of the building into an area between the buildings to urinate. While there, she was passed by a man carrying a rifle whom she recognized as appellant based on her knowledge of him "around the neighborhood." The man told her to "get ... out of here" and continued walking until he reached a gate in the area. He then raised the gun and fired "a lot of" shots into the street beyond the building before fleeing. Police found ten shell casings scattered in a line leading from the area over a distance of eleven to forty-seven feet from the curb. All of the casings were determined to have come from the same firearm, and expert testimony at trial established that the casings would have landed about three feet from the shooter as each shot was fired.

Kelly Hull emerged from the area where she had been and saw her brother Jamal

lying in the street. At trial she admitted that, on the night of the shooting, she had been drinking and that she was "addicted to PCP" but denied that either circumstance affected her ability to recognize appellant as the shooter. She also testified that she had seen Ernest Jennings leaning on a gate an hour before the shooting. The parties stipulated that Ernest Jennings was "badly beaten" by unknown individuals shortly after the shooting in a building about a block away.

At the conclusion of the trial, the defense moved for judgment of acquittal, arguing that the government had failed to establish the identity of the shooter as well as proof of premeditation and premeditation necessary for a first-degree murder conviction. The record reflects that the defense had vigorously asserted the deficiency of proof related to the identification of appellant as the person who fired the shots. The motion was denied and the government requested a second-degree murder charge as a lesser-included offense. The government suggested that the evidence could equally support the view that appellant fired the shots generally in the area of the group, evincing a conscious disregard for the extreme risk of death or serious bodily injury that could result. Notwithstanding the challenge regarding the issue of identify, the judge concluded an instruction was appropriate under a "depraved heart theory." Relying on *Comber v. United States*, the trial court observed that second-degree instructions were warranted in situations that included:

firing a bullet into a room occupied, as the defendant knows, by several people, starting a fire at the front door of an occupied dwelling, shooting into a moving automobile necessarily occupied by human beings, playing a game of Russian roulette with another person, [and] selling pure, i.e., undiluted heroin. It just seems to me that a rational con-

struction of the facts in this case could fit perfectly within those categories. . . . [T]he government's theory is that the defendant goes back and intentionally shoots Jamal Hull. But the law allows the government as a fall back to say that he went back and intentionally fired into the block, knowing that people where there and understanding that by doing so he was creating a grave risk of death or serious bodily injury to the people who were in the line of fire.

*See Comber*, 584 A.2d 26, 39 n. 13 (D.C. 1990) (en banc).

The jury subsequently acquitted on the first-degree murder charge but convicted on the lesser included second-degree murder charge. He argues that the result was to unfairly encourage the jury to compromise on the lesser-included charge as its verdict.

## II.

▮ We review jury instructions on lesser-included offenses to determine if they are supported by the evidence. *Shuler v. United States*, 677 A.2d 1014, 1017 (D.C.1996). We have said that "[t]his requirement is a minimal one; it means any evidence . . . however weak." *Id.* (citation and quotation marks omitted). The evidence requirement is met "where there is conflicting testimony on the factual issue" and "where the lesser included offense is fairly inferable from the evidence including a reconstruction of the events gained by accepting testimony of some or all of the witnesses even in part." *Coleman v. United States*, 948 A.2d 534, 551 (D.C.2008). Thus, a lesser-included offense instruction is properly given "where (1) the lesser included offense consists of some, but not every element of the greater offense; and (2) the evidence is sufficient to support the lesser charge." *Id.* If a jury crediting the

evidence could rationally convict on the lesser-included offense, then "the court must give the instruction no matter how inclined it might be to discount that evidence." *Id.* However, no lesser-included offense instruction is permitted where the jury "would have to engage in an irrational or bizarre reconstruction of the facts of the case." *Anderson v. United States*, 490 A.2d 1127, 1130 (D.C.1985).

In the circumstances of this case, appellant contests the jury instruction which allowed the jury to convict him of second-degree murder in the alternative. Second-degree murder requires "malice aforethought," which can be satisfied in one of four ways according to *Comber*, 584 A.2d at 26. These include (1) actions taken with a specific intent to kill but lacking in deliberate and premeditated malice, (2) acting with the specific intent to inflict serious bodily harm, (3) actions where the defendant knew subjectively that the act "created an extreme risk of death or serious bodily injury," and (4) killings occurring in the course of a felony. *Id.* at 38–39.

■ Here, it is the third type of action, sometimes called "depraved heart" murder, that the jury had to consider in appellant's case. We have described this as a killing that results from an action evidencing "a wanton and willful disregard of an unreasonable human risk as to constitute malice aforethought even if there is not actual intent to kill or injure." *Id.* at 39. In the District of Columbia, we hold that depraved heart murder can only be found where the perpetrator of the act "was subjectively aware that his or her conduct created an extreme risk of death or serious bodily injury, but engaged in that conduct nonetheless." *Id.* (footnote omitted). This may be shown by a "gross deviation from a reasonable standard of care" or by other acts that may lead the finder of fact to determine that the "defendant was aware

of a serious risk of death or serious bodily harm." *Id.*

Appellant contends, for a variety of reasons, that giving the lesser-included second-degree murder instruction was unfair. First, he argues that the prosecution pursued a theory of first-degree murder throughout the trial, implicitly rejecting the idea that the murder could have been other than a premeditated and deliberate act. And second, appellant argues that the instruction was prejudicial because, by allowing the jury to consider the second-degree murder charge, the court made it likely that the jury would compromise on the lesser-included charge if it could not agree on either conviction under first-degree murder or outright acquittal. At trial, in support of the premeditated murder count, the government argued that the shooter in this case had "plenty of time to think about it" and so the result "was a premeditated act of brutal murder." In defense, appellant focused on the credibility of witness Kelly Hull, questioning her ability to accurately identify the shooter based on her past history of PCP addiction and her alcohol consumption on the night of the murder. The instruction as to a lesser offense is deemed unfair, it is urged, because it increased the likelihood—in this case—that a jury would compromise its verdict and settle on the lesser offense.

■ Of course, each side in a criminal prosecution is entitled, respectively, to alternative theories of the case. An evidentiary restraint imposed is whether there is legally sufficient evidence to support an alternative charge offered by the government, *Coleman, supra,* 948 A.2d at 551, or in the instance of an alternative affirmative defense, some evidentiary showing for the alternative defense. *See McNeil v. United States,* 933 A.2d 354 (D.C.2007). The jury must be instructed as to the alternative purpose of the other charge or other de-

fense. Here, the crux of the defense challenge is that the evidence was deficient regarding the locations of the people in the area, the lack of knowledge that appellant was aware of the decedent's presence when the shots were fired, and any animus underlying the shooting. However, the theory of the lesser charge does not rest on such facts; rather it is premised on a severe risk imposed by conduct that will probably cause death. Appellant asserts that the number of shots fired from the cut of the building, the type of firearm, and the elapsed time between the argument and the shooting can only support the theory that murder was premeditated, and then only if the jury believed evidence that ten shots were fired into an area where a group of people had been gathered throughout the evening to socialize. In fact, a government witness testified that immediately after the shooting stopped there were "too many people around" to see the victim at first. On these facts, a reasonable jury could have decided that the government had not sufficiently established premeditation and deliberation with respect to the shooter's intent to kill the victim, while still crediting Kelly Hull's identification of the shooter to arrive at a conviction on second-degree murder. The jury would not have to engage in a "bizarre reconstruction" of events to arrive at a conclusion described in *Comber* and cited by the trial court here. On the record before us the evidence was sufficient to support a finding that appellant—in a residential neighborhood—engaged in behavior that created an extremely high risk of harm to others, knowing that death or serious injury would probably occur. We think this case falls well within the settled principles regarding a depraved heart killing, second-degree murder.

We also consider appellant's claim that the instruction was unfairly prejudicial because it increased the likelihood that a conflicted jury would compromise on the lesser-included offense instead of continuing to deliberate between first-degree murder and acquittal. In support of this claim, appellant points to the focus of the defense at trial, which centered on the identity of the shooter. In considering this challenge, we look at the instruction given by the trial court. Here the jury was instructed on the elements of first-degree murder by the court, followed by the elements of the lesser-included second-degree murder charge. After that instruction, the jury was told the order in which it should consider the charges, specifically "consider first whether the defendant is guilty of the greater offense." And further, the court instructed "the only circumstance in which you would consider the . . . lesser included offense . . . is if all 12 of you have unanimously found that the defendant is not guilty of first-degree premeditated murder while armed."

We conclude the evidence presented was sufficient to support a conclusion of second-degree murder. The record shows the trial court properly instructed the jury on when it could consider the second-degree murder charge. Because we presume that the jury followed the instructions they were given, not to consider the lesser-included charge unless they had first ruled out the first-degree murder charge, appellant's contention that there was a compromise verdict is unpersuasive. Accordingly, the judgment on appeal is hereby affirmed.

*So ordered.*

FERREN, Senior Judge, dissenting:

Commonly, a defendant charged with first-degree premeditated murder while armed will ask for a jury instruction on second-degree murder while armed as a lesser included offense in the obvious hope,

if convicted, of receiving a lighter sentence. The instruction will be given if there is any evidence, "however weak," from which the lesser offense is "fairly inferable."[1] Occasionally, however, the government—particularly, as in this case, when misidentification is the principal defense-will seek the lesser—included instruction while the defendant, hopeful if not confident that his defense will prevail, resists the government's fallback instruction out of concern that it will lead to a compromise verdict of guilty on the lesser charge, rather than acquittal on the indicted charge that demands a higher level of proof. We have this second situation here.

The criteria for granting or rejecting the lesser-included instruction are the same whether the government or the defense requests it, and thus the trial court—and eventually this court de novo[2]—must make the same analysis of the record without regard to the parties' respective positions on it. As far as I have been able to determine, this court has never reversed a conviction when the trial court granted a government-requested lesser-included offense instruction over the defendant's objection. In my judgment, this should be the first such reversal.

The trial court perceived a reasonable possibility that the jury could find Ricardo Jennings guilty of second-degree murder on a "depraved heart" theory, meaning that the evidence supported a finding that Jennings was "subjectively aware" that his "conduct created an extreme risk of death or serious bodily injury, but engaged in that conduct nonetheless."[3] In applying this test, however, the trial court may not give the lesser-included offense instruction when, in order "to convict on the lesser offense, the jury would have to engage in an irrational or bizarre reconstruction of the facts of the case."[4] I do not believe that, on this record, the jury could have found a mere "depraved heart" murder without such irrational, if not bizarre, reconstruction.

In a colloquy with counsel, the trial court justified the second-degree murder instruction by reference to examples drawn from the LaFave & Scott treatise quoted in our en banc decision in Comber,[5] and again en bloc in the majority opinion. In my judgment, however, the evidence in this case cannot be rationally interpreted in a way that fits any such example, for two reasons: (1) the jury could not rationally discern an *un* premeditated intent to kill Jamal Hull, and (2) the evidence does not support a finding that others, in addi-

---

1. *Coleman v. United States*, 948 A.2d 534, 551 (D.C.2008) (citations and internal quotation marks omitted).

2. *See Leak v. United States*, 757 A.2d 739, 740–741 (D.C.2000).

3. *Comber v. United States*, 584 A.2d 26, 39 (D.C.1990) (en banc). The trial court instructed on second-degree murder while armed as follows. The parties do not question the language.
The essential elements of the lesser included offense of second-degree murder while armed, each of which the government must prove beyond a reasonable doubt, are, first, that the defendant caused the death of the decedent, Jamal Hull; second, that at the time the defendant did so, he had the specific intent to kill or seriously injure the decedent or acted in conscious disregard of an extreme risk of death or serious bodily injury to the decedent; and, third, that at the time of the offense the defendant was armed with a firearm. Second-degree murder while armed differs from first-degree premeditated murder while armed in that it does not require premeditation, deliberation, or a specific intent to kill.

4. *Anderson v. United States*, 490 A.2d 1127, 1130 (D.C.1985).

5. *Supra* note 3, 584 A.2d at 39 n. 13.

tion to Jamal Hull, were in the way of the killer's bullet spray with an AK–47.

No one disputes that considerable evidence supports premeditated first-degree murder, the theory on which the prosecution was tried. What I cannot find on this record is any lesser state of mind in the killer. The government argues that the evidence would permit the jury to infer that Jennings was only trying to "scare" Hull, or to infer that Jennings "formed the intent to kill only at the last possible moment and thus the murder was not premeditated or deliberated." From my reading of the record, both suggestions are pure speculation.

The government adds that the "jury reasonably could have inferred that appellant's intended victim was Ms. [Monique] Hines, or any of the 'other people' with whom Ernest Jennings"—appellant's uncle for whom appellant was the alleged avenger—had argued "earlier in the evening." This last argument for a second-degree, "depraved heart" state of mind depends on the second category of evidence I find missing: that other persons were in range of the killer's bullets. There is no evidence that Monique Hines was in the area, or that any "other people" were in range of the armed assault. Even the trial judge indicated that he was "not clear ... whether there were other people out in the immediate area where the decedent was when he was hit," although he added that "a rational inference could be drawn that the defendant came around the corner and essentially shot into a crowd of people, not necessarily specifically intending to kill Jamal Hull and maybe not even anyone else in particular, but that he shot ... down the block of a street where there were a lot of people hanging out." The problem is, however, that there is no record evidence that others besides Hull were

"hanging out" where they could have been hit by the shooter.

Let's look at the testimony in connection with government exhibit 122, an aerial diagram of the scene unchallenged by the defense and elucidated by detailed interchange at oral argument. In this aerial view, the right portion of the apartment complex looks like a rectangular horseshoe with one wide building across the top and two shorter, connected buildings down each side enclosing a large courtyard facing 2nd Street, S.W. The shooter came walking down a "cut" (a sidewalk) along the right side of the complex heading toward 2nd Street. As evidenced by shell casings that, according to expert testimony, fell within three feet of each firing, he took one shot before reaching the end of the front building, # 1520. He then began shooting rapid-fire toward the street, dropping nine more cartridges in a grassy area at the end of building 1520 in front of the sidewalk on 2nd Street. Hull lay dead in the street in front of his car at a slight angle from the end of the building toward the courtyard. From the diagram scrutinized at oral argument, it is clear that the trajectory of the bullets from the shooter to Jamal Hull could not have hit anyone in the courtyard around the corner from the shooter. So: was there probative evidence that anyone but Hull was out there in Hull's vicinity? No.

The evidence on which the government primarily relies for purposes of the second-degree murder instruction is the testimony of Keisha Brighthaupt, who had been sitting inside the courtyard in front of building 1520 talking with Jamal Hull, while other people "were just standing around" there. Hull then went to find his sister, who had left to go to the bathroom in the cut. Soon thereafter, as Brighthaupt got up and began "walking out of the court," she heard gunshots. At first she could not

tell where they were coming from but then discerned that they were coming from the direction of the cut. She ran to 2nd Street and hid behind a van parked there.

Brighthaupt further testified that "after the shots stopped," she heard her sister say, "oh, my God, it's Ish [Jamal Hull]. So, that's when I came out [from behind the van] and we all—I just was standing right there just looking." At first, she added, she could not see where Hull had fallen, "because it was too many people around.... But when the police got there, I seen it." Officer Robert Baechtel, who had heard the gunfire from two or three blocks away, arrived at the murder scene within "45 seconds to a minute" and "saw a large crowd standing on the sidewalk with several individuals in the middle of the street." Naturally, people would gather at a homicide scene after a shooting. But before?

There was evidence that there had been a party in the courtyard earlier in the evening, and that a number of individuals were lingering there at around 2:00 a.m., sitting on lawn chairs in front of building 1520 when the shooting occurred.[6] The courtyard is invisible from the cut on the side of the complex where the shooter walked; and, of determinative significance, the area of the courtyard where individuals reportedly had remained was not within eyesight of the shooter. Keisha Brighthaupt's testimony put the other people, who were "standing around" before Hull left to look for his sister, well outside the line of fire. They were inside the court-

yard, in front of building 1520—an area slightly *behind* the grassy area at the end of building 1520 where the nine shell casings were found. Even Brighthaupt herself, when beginning to leave the courtyard as she heard the shots, was not sure at first where they were coming from. As far as one can tell from the testimony and the diagram in government exhibit 122, the killer would have had to shoot around a corner to hit anyone other than Hull. It follows that none of the hypothetical situations involving more than one individual, as quoted by the trial judge from *Comber*[7] to illustrate a "depraved heart," are relevant here.

The two "depraved heart" hypotheticals concerning an assailant with one victim— playing Russian roulette and selling undiluted heroin—also are inapplicable. The trial judge, preferring the Russian roulette analogy, opined that a second-degree murder instruction would be proper "even if there's just one person in a street, and you start firing, firing an AK–47 down the street in that person's direction." That opinion presupposes an indifferent state of mind that, from my reading, nothing in the record supports.[8]

Language from one of our opinions ruling for the government in which we affirmed the denial of a defense request for a lesser-included second-degree murder instruction fits perfectly: "Here, the record reveals no dispute regarding [Jennings'] state of mind. His defense theory was misidentifiction, and thus the only issue

---

6. Government exhibit 122 showed the location of one arm chair at the edge of the sidewalk directly in front of the courtyard, far away from the front of building 1520. There was no evidence that anyone was in that chair near, or at, the time of the shooting.

7. *Supra* note 5.

8. The trial judge rejected the government's argument that "people could have been sitting [or] sleeping in their cars" on the street where Hull was killed. The judge noted that for conviction of second-degree murder "the defendant has to know that there are people in the line of fire," and added that "there's no testimony that there was anyone in any of those cars."

regarding the murder[ ] was the identity of the assailant." [9]

Respectfully, therefore, I dissent. I cannot find the error harmless. I therefore would reverse the judgment of conviction for second-degree murder and remand for a new trial.

---

**9.** *Bright v. United States,* 698 A.2d 450, 457–458 (D.C.1997).