**Antoine E. COLEMAN, and Quincy M. Jones, Appellants,**

v.

**UNITED STATES, Appellee.**

**Nos. 04–CF–524, 04–CF–772.**

District of Columbia Court of Appeals.

Argued Oct. 24, 2006.

Decided May 22, 2008.

Patrick T. Hand, Washington, appointed by the court, for appellant Coleman.

Judith A. Lovelace, appointed by the court, for appellant Jones.

John P. Mannarino, Assistant United States Attorney, with whom Kenneth L. Wainstein, United States Attorney at the time the brief was filed, Roy W. McLeese III, and Amanda Haines, Assistant United States Attorneys, were on the brief, for appellee.

Before RUIZ and KRAMER, Associate Judges, and NEBEKER, Senior Judge.

RUIZ, Associate Judge:

This case involves the shooting deaths of two teenage boys, Mylan Lucas and Hakim Williams, in July of 2000, in Southeast Washington. Quincy Jones and Antoine Coleman were jointly tried for the murders before a jury. The jury convicted Coleman of two counts of first-degree premeditated murder, one count of carrying a dangerous weapon (CDW), one count of possession of a firearm during a crime of violence (PFCV), and one count of obstruction of justice. Jones was convicted of two counts of second-degree murder, as lesser included offenses of the first-degree premeditated murder charges, one count of PFCV, and one count of CDW. We affirm Coleman's convictions. With respect to Jones, we affirm his conviction for CDW but vacate his convictions for second-degree murder and PFCV because the trial judge erroneously instructed the jury as to the intent required to sustain those guilty verdicts as an aider and abettor.

**Factual Background**

*The Government's Case*

The government presented the testimony of two eyewitnesses as well as acquaintances of Coleman and Jones with whom they spoke about the murders. A description of the testimony at trial is necessary for our analysis.

*Samuel Bowman*

Samuel Bowman testified that on July 14, 2000, he was drinking alcohol by the parking lot near his apartment. Around 10:30 p.m., he went inside his apartment where several young men were playing video games, including his cousin, Micky Curtis, and his friends, appellant Jones, Andre Scott and Dante Scott.[1] A little while later, Samuel's brother, Kevin, came to the window of the apartment and told the occupants that somebody was breaking into Jones's car. Kevin asked them to "hold him down," which was a request to "hand him [a] gun." After Curtis gave him a shotgun, Kevin walked to the parking lot. According to Samuel, Jones then went outside to "talk to the boys that.... [Kevin] said had broken in [sic] his car."

Samuel Bowman testified that he stood in the doorway to his apartment and could see Jones talking to the two teenage boys—Lucas and Williams—in the parking lot but could not hear what they were saying.[2] After Jones spoke with them briefly, Samuel saw him cross the parking lot and go into a building. A "couple of minutes later" he saw Jones and Coleman[3] come out of the building and walk toward Lucas and Williams. Jones was carrying a

1. Andre Scott and Dante Scott are brothers.

2. Samuel knew Lucas because they went to the same junior high school but did not know Williams.

3. At the time of the murders, Coleman lived in a nearby apartment rented by a man named Butch Greene.

"machine gun." [4] As they approached, Jones handed the weapon to Coleman and then patted down Lucas's and Williams's pockets.

After the pat-down, Samuel saw that Coleman started firing the machine gun; he also saw his brother, Kevin, shoot the victims with the shotgun.[5]

*Dante Scott*

Dante Scott also testified for the government as an eyewitness to the murders. He testified that on July 14, 2000, he was playing video games with Samuel, Curtis, and Jones. Kevin came to the window and told them that "someone was messing around with Quincy's [*i.e.*, appellant Jones's] car." He asked for a gun, and someone from inside the apartment—Scott did not know who—handed him a shotgun. Dante then left the apartment and stood by the entrance to the apartment building. There, he saw Kevin, Jones and Coleman in the parking lot. Kevin was holding the shotgun that he had been given by the person inside the apartment and Jones was holding a "rifle-machine gun." Dante said that he saw Jones "go[ ] through the pockets or search the pockets of . . . both of [Lucas and Williams]," and then Coleman and Bowman shot them.

According to Dante, he then turned around and walked to the exit on the opposite side of the apartment building to retrieve his car, which was parked behind the apartment complex. He drove to the parking lot where Lucas and Williams had just been shot. Jones asked him for a ride home, and he agreed. According to Dante, Jones was "shook up," but they did not talk about the shooting.

Dante also testified that one evening soon after the shootings, he spoke with Coleman about the murders. According to Dante, Coleman told him that he knew one of the victims from the neighborhood, because he "stayed around his . . . daughter's mother's complex . . . . [and] gave him kind of a look." [6]

---

**4.** Samuel testified that he had previously seen Coleman with the machine gun that was used to murder the victims on July 14, 2000.

**5.** Samuel's testimony was impeached in several ways. At trial, he admitted that he had been drinking alcohol and smoking marijuana on the evening of the murders. The defense also claimed that Samuel was biased, because his brother, Kevin, pled guilty to the murders and therefore Samuel had an interest in "tell[ing] the story the same way [his] brother said it."

In fact, Samuel did not contact the police after the murders and only spoke with them after he was subpoenaed two years after the shootings, after his brother had "made a deal with the government." Samuel initially denied being an eyewitness to the murders. After he was subpoenaed to appear before the grand jury, he was interviewed at the United States Attorney's Office building. He told the interviewers that he was asleep at the time of the murders.

Samuel contradicted himself before the grand jury. He told the grand jury at one point that he did not go outside until after the shootings, but at another point he testified that he observed the shootings. At one point during his testimony before the grand jury, he testified that Jones was not present in the apartment when someone knocked on the window, but later he indicated that Jones was, in fact, present.

His testimony at trial was also inconsistent with portions of his grand jury testimony. Although he testified at trial that he could not hear the conversation between Jones and the victims, at the grand jury he testified that Jones asked the victims why they broke into his car and that he could "hear what [Jones] had to say." In addition, at trial he testified that his brother, Kevin, was the person who knocked on the window and asked for a gun, but he told the grand jury that he did not know the identity of that person. The grand jury testimony took place before Kevin plead guilty, and the trial took place after Kevin's guilty plea.

**6.** Dante's testimony at trial was significantly impeached, particularly with respect to Jones's involvement. Dante did not immedi-

### Andre Scott

Dante's brother, Andre, testified that Coleman confessed to the murders on two separate occasions. He testified that on July 14, 2000, he was sleeping when one of his friends awoke him and told him that "one of [his] friends got shot." He looked outside his apartment window and saw two bodies on the ground. Andre walked over to Greene's apartment, where he saw Coleman. According to Andre, he told Coleman about the two bodies, and Coleman responded "you know how I do, I don't play." Andre understood this to mean that Coleman was responsible for shooting Lucas and Williams.

The following day, in the afternoon, Andre was with Kevin and Coleman in their neighborhood. Coleman described the shooting, saying that somebody had attempted to break into a car in the parking lot and then he "tried to shoot them six times apiece."

Andre also testified that about a week after the murders, Coleman told him that he was "going to get rid of the gun, break it—take it apart or something .... because the police was already on to Kevin." Scott knew the gun Coleman was referring to because he had previously seen him with it.[7]

ately come forward to the police or prosecutors with information about what he knew, and the defense argued that his testimony at trial was the product of a deal with prosecutors involving a plea agreement in a separate matter involving an arrest at his daughter's mother's house on August 2, 2000. He was initially charged with five counts: possession with intent to distribute cocaine, possession of an unregistered firearm, possession with intent to distribute marijuana, possession of a firearm during a crime of violence or dangerous offense, and possession of ammunition. The charge of possession of a firearm during a crime of violence carried a mandatory minimum of five years incarceration. *See* D.C.Code § 22–3202(a)(1) (1981). In return for testifying in this case, Dante pled guilty to two counts, carrying a pistol without a license and possession with intent to distribute cocaine, neither one of which requires mandatory incarceration.

Like Samuel's testimony, Dante's was contradictory and inconsistent with the versions he initially presented to the investigators and the grand jury. After he was arrested in connection with the drug and weapons charges, he was subpoenaed to the grand jury. He initially met with Assistant United States Attorney (AUSA) Jonathan Rosen and told him that he did not know anything about the murders because he was not there at the time. Moreover, he appeared before the grand jury twice—on April 23, and April 25, 2000—and, in describing his account of the shootings, he never mentioned that Jones was present in the parking lot on the night of the murders. Dante admitted that between the time that he testified before the grand jury (when he did not mention Jones's presence) and February of 2002, when he pled guilty to the separate drug and weapons charges in return for testifying in this case (and implicated Jones), he had an argument with Jones while playing video games and had "stopped coming around" to Jones's apartment.

7. Andre was impeached on cross-examination. It was Coleman's defense at trial that Andre was the person, along with Kevin, who shot Lucas and Williams that night. When Andre was initially interviewed by the police, the detectives told him that Coleman had told them that Andre was the shooter. It was only after he was told that Coleman had implicated him that he told the detectives that Coleman was the shooter. During re-direct examination, the prosecutor asked him "why [he was] telling [the jury] what [he] testified to," and Andre responded, "[m]ainly because [Coleman] said that I was the one who did the shooting."

In addition to arguing that Andre's testimony against Coleman was retribution for Coleman's having identified him as the shooter, the defense argued that Andre had other reasons to be biased against Coleman, and elicited testimony from Andre that he had become aware that Coleman had stolen some cocaine from him, had confronted Coleman at gunpoint and recovered the cocaine.

*Rhea Shariati*

Rhea Shariati, who was Coleman's girlfriend at the time of the shooting, testified for the government but was not an eyewitness to the murders. One day in May of 2001, Shariati visited Coleman in jail and asked "what was going on." According to Shariati, Coleman told her that the two victims were attempting to break into a car, and that he and Kevin held them at gunpoint, and then shot them.[8]

Shariati testified that she was "in love with him so [she] was going to stick by him," and she continued to have contact with Coleman—both in person and through letter correspondence. In one of the letters, Coleman had instructed her to tell the police that she did not know anything about the murders if they ever interviewed her.[9]

*Walter Thomas*

Walter Thomas testified that Jones confessed his involvement in the murders to him. On February 15, 2002, Thomas was arrested in the District for a probation violation, and he was placed in a holding cell with Jones.[10] Thomas went to court and after his probation was revoked, he was placed in a cell in the D.C. Jail with Jones.

Thomas testified that while they were in the cell together, Jones confessed to his involvement in the murders. According to Thomas, Jones told him that Kevin alerted him that somebody was attempting to break into his car.[11] Jones told him that he then retrieved a rifle from Coleman's apartment, approached the victims, and patted them down. Kevin then asked Jones "what you going to do about this here, he tried to carry you and so what you going to do?," Jones replied, "fuck 'em.'" After he uttered those words, Coleman and Kevin shot the victims.[12]

8. Shariati did not testify regarding Jones's involvement in the murders.

9. Like Samuel and Dante, Shariati initially told the investigators that she did not know anything about the murders. After approximately 25 minutes of being interviewed, however, she told the detectives about Coleman's confession. At trial, she was not impeached with any statements she made before the grand jury.

10. Thomas did not know Jones before he met him on February 15, 2002.

11. Jones's theory at trial was that Thomas "got some [of the] facts" about the charges against Jones from some of the paperwork that Jones had in their cell, and, in order to curry favor with the United States Attorney's Office for early release, he agreed to testify against Jones and fabricated some of his testimony.

12. Thomas's testimony at trial was impeached. He had a substantial criminal history that was presented to the jury, including convictions for two counts of armed robbery, assault of a police officer, the crime of escape, possession of contraband while in jail, at-tempted distribution of cocaine, distribution of heroin, and violation of the Bail Reform Act. In addition, at the time of trial, there were charges pending against him for possession of heroin.

On cross-examination, Thomas admitted that when he originally appeared before the judge regarding his probation violation, he believed he was going to be released because he thought his probation violation was a relatively minor criminal infraction. However, on February 25, 2002, the judge sentenced him to six months of incarceration. The next day, on February 26, 2002, he wrote a letter to AUSA Rosen indicating that he had information relating to the murder of Lucas and Williams. In that letter, he asked AUSA Rosen to "get me out now and get my [driver's] license straightened out so I can leave D.C." Although the government argued that his request was no more than an expression of concern for his safety and that of his family, who he feared would be in danger if he were to testify, defense counsel argued that it was an attempt to make a deal with the government for early release in return for testifying in this case.

Finally, Thomas testified that when he was arrested in February of 2002, he was not

*The Defense Case*

Jones did not testify at trial and his defense was a general denial. Defense counsel relied on the impeachments of the three witnesses who described his involvement in the murders—Samuel Bowman, Andre Scott, and Walter Thomas, see notes 5, 6 and 12, *supra*—to create a reasonable doubt of guilt.

Coleman's defense theory was that Andre Scott and Kevin Bowman were the shooters. He testified on his own behalf, denied shooting either of the victims, and denied that Jones was present in the parking lot when Andre and Kevin shot them. According to Coleman, on the evening of the murders, he was near the parking lot talking to Kevin, Andre and Jones. The group split up when Jones "walked off." Coleman then walked away also, towards another street in an attempt to find some marijuana. He did not see anyone selling marijuana and returned to the parking lot five to ten minutes later.

When Coleman returned, he saw Kevin and Andre "holding two guys at gunpoint." He saw Andre shoot one of the victims, and then ran to Greene's apartment, where he was living. According to Coleman, about forty-five minutes later, Andre knocked on his apartment door and told him "not to say nothing about what [he had] seen, and if [he] did, [he] would be killed the same way."[13]

With respect to his girlfriend Shariati's testimony that he confessed to her, Coleman denied ever confessing to the murders, and instead claimed that he had described the accusations against him when he told her about his presence at the scene of the crime. In addition, he testified that when he told Shariati to tell the police that she did not know anything about the murders, he simply meant for her to tell the truth—that she was not around when the murder took place—because he "didn't want her involved" for her own well-being.

On cross-examination, Coleman admitted that on January 22, 2002, he had met with AUSA Rosen and detectives and told them that he saw "the two guys being held at gunpoint by Kevin [Bowman]," and that he shot one of the victims. He did not mention anything about Jones's involvement.[14]

### Analysis

### I. Antoine E. Coleman (No. 04–CF–524)

Coleman raises three issues on appeal: (1) the trial court's failure to *sua sponte* exclude Shariati's testimony on the basis that their conversations and letters were

addicted to heroin because he was using methadone, a narcotic-withdrawal medication, and he was being given methadone by medical services while in jail. However, the defense called Willie Cain, the medical records technician at the D.C. Jail, who testified that Thomas was, in fact, addicted to heroin and was in heroin withdrawal when he was admitted. Moreover, according to Cain, there was no indication that Thomas was using methadone, and the Jail's medical records indicated that he was not given any methadone for treatment.

13. During cross-examination, Coleman admitted that he initially did not tell the police that Andre had threatened him shortly after the

murders. Instead, Coleman told the police that when Andre arrived at his apartment and confessed to the murders, he gave him a "high five."

14. The government called AUSA Rosen as a rebuttal witness. According to AUSA Rosen, he and two detectives met with Coleman and his attorney at the United States Attorney's Office building. AUSA Rosen testified that Coleman became "very pensive" and "admitted shooting, he admitted using a weapon and doing the murders." He confirmed that Coleman never mentioned Jones during the interview.

privileged; (2) the trial court's denial of his motion to sever his trial from Jones's; and (3) prosecutorial error that he claims deprived him of a fair trial.

### A. Spousal Privilege

■ Coleman argues, for the first time on appeal, that he and Shariati "had a common-law marriage," and therefore, his communications with her—including his confession to her—were protected by a spousal immunity privilege. Because the argument was not raised before the trial court, our review is limited to plain error. *See United States v. Olano,* 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). "On a plain error review, an appellant must show that the objectionable action was (1) error, (2) that is plain, (3) that affects substantial rights, and (4) that seriously affects the fairness, integrity or public reputation of judicial proceedings." *Marquez v. United States,* 903 A.2d 815, 817 (D.C.2006).

■ There was no error, much less plain error, in the admission of Shariati's testimony of her conversations with Coleman. Under D.C.Code § 14–306(b) (Supp.2006), "[i]n . . . criminal proceedings, a spouse or domestic partner is not competent to testify as to any confidential communications made by one to the other during the marriage or the domestic partnership." This jurisdiction has made clear that persons in common-law marriages may invoke the protection of the statutory privilege. *See Mesa v. United States,* 875 A.2d 79, 83 (D.C.2005). "The elements of common law marriage in this jurisdiction are cohabitation as husband and wife, following an express mutual agreement, which must be in words of the present tense." *Coates v. Watts,* 622 A.2d 25, 27 (D.C.1993) (citation omitted). "[T]he existence of an agreement may be inferred from the character and duration of cohabi-

tation . . . ." *Mesa,* 875 A.2d at 83 (quoting *Marcus v. Director,* 179 U.S.App. D.C. 89, 93 n. 9, 548 F.2d 1044, 1048 n. 9 (1976)).

■ Shariati testified that she met Coleman in March of 2001, and had dated him for only one or two months before he was arrested and incarcerated in this case. During this period, they spent two nights a week together in the same residence (either her house or his apartment). Shariati also made clear at trial that during this time, they did not refer to each other as "husband and wife." Shortly after Coleman was arrested (while he was incarcerated), Coleman asked Shariati to marry him, and she agreed. Accordingly, prior to when she agreed to marry Coleman, they did not have a common-law marriage because they did not consider themselves spouses or cohabit, as required in this jurisdiction. *See Coates,* 622 A.2d at 27. Nor did they have a common-law marriage after they were engaged, because Coleman was incarcerated and they did not live together. Accordingly, their communications were not protected by the spousal privilege and the trial court did not err by failing to *sua sponte* exclude Shariati's testimony.

### B. Severance

■ "The decision to sever cases is committed to the sound discretion of the trial court." *Hammond v. United States,* 880 A.2d 1066, 1089 (D.C.2005) (citation omitted). "This court will reverse the trial court's decision 'only upon a clear showing that it has abused its considerable discretion.'" *Id.* (quoting *Sterling v. United States,* 691 A.2d 126, 135 (D.C.1997)). "To demonstrate an abuse of discretion, a defendant must show not simply prejudice, but that [he or she] suffered manifest prejudice from the joinder of their cases." *Id.* (quotation marks omitted) (alteration in original). Indeed, "[t]here is a longstand-

ing presumption that favors trying appellants jointly when they are charged with jointly committing a criminal offense." *Id.* (quotation marks and citation omitted).

■■■ Appellant Coleman argues that the admission of Jones' statements at trial—through Walter Thomas's testimony—violated his Sixth Amendment right to confront witnesses against him because Jones did not testify and, therefore, Coleman could not cross-examine him regarding the statements.[15] As the Supreme Court held in *Davis v. Washington,* 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), however, it is only *testimonial* hearsay statements that are subject to the Confrontation Clause. *See id.* at 823–24, 126 S.Ct. 2266 ("A limitation so clearly reflected in the text of the constitutional provision must fairly be said to mark out not merely its 'core,' but its perimeter.").[16] Statements made in casual conversation between two inmates do not come within the Court's definition of testimonial statements. *See Crawford,* 541 U.S. at 51, 124 S.Ct. 1354 ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.").

■■■ In his brief on appeal, Coleman argues that "[n]one of [the three] statements w[as] admissible against [a]ppellant under any hearsay exception," but he does

not explain why the trial court erred in concluding that the statements were against Jones's penal interest. Accordingly, he has abandoned this argument on appeal. *See Bardoff v. United States,* 628 A.2d 86, 90 n. 8 (D.C.1993) (citations omitted); *see also* D.C.App. R. 28(a)(8)(A) (briefs on appeal must contain "the appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies."). Without a preserved argument as to why the statements are not admissible as declarations against interest, Coleman's claim that the trial court abused its discretion in denying the motion for severance has no support. We, therefore, have no basis to conclude that the trial court abused its discretion in denying Coleman's motion to sever their trials.

### C. Prosecutorial Error

Coleman also complains of three instances of what he claims amounted to prosecutorial misconduct and argues that the trial court erred in denying his motions for a mistrial after objecting to the misconduct. Coleman argues that the trial judge erred in permitting AUSA Rosen to testify, that the prosecutor improperly suggested in his questioning that Dante Scott agreed to take a polygraph test as a part of his plea bargain with the government, and that the trial court permitted the prosecutor to impermissibly vouch for the credibility of

---

**15.** Thomas testified that Jones told him in jail that (1) he retrieved a rifle from Coleman's apartment; (2) Kevin and Coleman were the shooters; and (3) Coleman threw the rifle in the sewer.

**16.** The trial judge concluded that the statements were admissible as statements against Jones' penal interest, were therefore reliable, and as such, "we allow [them] ... irrespective of lack [of] confrontation." *See Akins v. United States,* 679 A.2d 1017, 1030 (D.C.1996) (noting, based on *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980),

that the "Confrontation Clause is only violated by the admission of incriminating evidence under a hearsay exception that is neither firmly-rooted nor reliability-based."). This view of the Confrontation Clause was superseded by the Supreme Court in *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), which overturned the analytical framework in *Roberts* that evaluated compliance with the Confrontation Clause in terms of reliability and the law of hearsay evidence. *See id.* at 62, 100 S.Ct. 2531.

government witnesses during rebuttal argument. On appeal, he argues that each of the errors justifies vacating his convictions, but urges that we should also consider the prejudicial effect of the errors cumulatively in assessing their overall taint on the trial. Although we conclude that two of the prosecutor's challenged actions were improper, we deem one to have been cured by the judge's instruction and the other harmless, so cumulative error analysis is inapplicable. *See generally Coreas v. United States*, 565 A.2d 594, 605 (D.C. 1989).

### 1. AUSA Rosen

At trial, when the government informed the court that it intended to call AUSA Rosen to testify, defense counsel objected, stating, "I'm going to move to disqualify the U.S. [A]ttorney's [O]ffice from prosecuting Mr. Coleman." The trial judge denied the motion, and Coleman now argues that the trial court's ruling amounts to reversible error.[17]

We do not perceive any error. AUSA Rosen did not prosecute the case before the jury, and we are aware of no authority that prohibits the government from calling a material witness in a case merely because he is a member of the office responsible for prosecution. Coleman relies primarily on *Robinson v. United States*, 32 F.2d 505 (8th Cir.1928), where the Court of Appeals reversed a defendant's conviction because an AUSA testified for the government. The case is readily distinguished, however, because in *Robinson* the testifying prosecutor was the same person trying the case before the jury. Coleman's reliance on Rule 3.7(a) of the D.C. Rules of Professional Conduct is also inapt because, like *Robinson*, the rule is concerned with instances where *trial counsel* takes the witness stand.[18] We cannot discern any impropriety in having an AUSA, who is not personally trying the case, testify as a witness to material facts within his or her personal knowledge.[19] Accordingly, we conclude that the trial court did not err in permitting AUSA Rosen to take the stand.

### 2. Polygraph Test

On direct examination, Dante Scott testified about the terms of his plea agreement with the government. *See* note

---

17. Responding to the motion, the trial judge asked whether the attorneys were "taking turns to see who can make the silliest argument."

18. Rule 3.7 states:

 (a) A *lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness* except where:
 (1) The testimony relates to an uncontested issue;
 (2) The testimony relates to the nature and value of legal services rendered in the case; or
 (3) Disqualification of the lawyer would work substantial hardship on the client.
 (b) A lawyer may not act as advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness if the other lawyer would be precluded from acting as advocate in the trial by Rule

1.7 or Rule 1.9. *The provisions of this paragraph (b) do not apply if the lawyer who is appearing as an advocate is employed by, and appears on behalf of, a government agency.*
(Emphasis added).

19. We recognize that juries may be influenced by the prestige of the prosecutor's office, *see United States v. Sayakhom*, 186 F.3d 928, 943 (9th Cir.1999), and that this consideration could be relevant in determining whether a prosecutor's testimony is substantially more prejudicial than probative. *See Johnson v. United States*, 683 A.2d 1087, 1099 (D.C. 1996). However, on appeal, Coleman does not raise the argument that the trial court erred in weighing the probative value against the prejudicial effect, and therefore we have no occasion to address it. We note, however, that Coleman's confession to a prosecutor was highly probative of his guilt.

6, *supra.* At one point during the examination, the prosecutor asked whether the agreement required him "[t]o take polygraphs," and before defense counsel objected, Dante responded "Yes." Defense counsel moved for a mistrial on the basis that the response gave "the jury the wrong impression that somehow [Dante] has been given a polygraph to verify his testimony." The government confirmed to the court that Dante had not, in fact, taken a polygraph to verify his testimony at trial. The trial judge immediately instructed the jury that "[t]here is no suggestion that a polygraph was ever given and you should not construe the presence of that in the agreement as having any significance whatsoever."

> A ruling on [a motion for a mistrial] is committed to the sound discretion of the trial court, and we will not overturn [its] decision unless it appears unreasonable, irrational, or unfair ... or unless the situation is so extreme that failure to reverse would result in a miscarriage of justice.

*Daniels v. United States,* 738 A.2d 240, 248 (D.C.1999) (quotation marks and citation omitted) (second alteration in original). Indeed, we have stated that "[w]henever possible, the court should seek to avoid a mistrial by appropriate corrective action which will minimize potential prejudice." *Goins v. United States,* 617 A.2d 956, 958 (D.C.1992). "Thus a trial court does not abuse its discretion when prejudice can be cured by an instruction to the jury...." *Daniels,* 738 A.2d at 248 (quotation marks and citation omitted).

 In *Peyton v. United States,* 709 A.2d 65 (D.C.1998), this court set out a number of factors relevant to the determination of whether mention of a polygraph warrants a mistrial. We noted that

> [i]n determining whether evidence of a lie detector test was so prejudicial that it

denied the defendant a fair trial, courts have looked at many factors. The factors that have been considered include: (1) whether the reference to a lie detector was repeated or whether it was a single, isolated statement; (2) whether the reference was solicited by counsel, or was an inadvertent and unresponsive statement; (3) whether the witness making the reference is the principal witness upon whom the entire prosecution depends; (4) whether credibility is a crucial issue; (5) whether a great deal of other evidence exists; and, (6) whether an inference as to the result of the test can be drawn. No single factor is determinative in any case. The factors themselves are not the test, but rather, they help to evaluate whether the defendant was prejudiced.

*Id.* at 70 (citations omitted). In addition to outlining the factors relevant to a prejudice determination, we recognized that "the overwhelming weight of authority in cases involving the disclosure that a witness took a polygraph test supports the position that an effective instruction by the judge is sufficient to avoid a mistrial." *Id.* at 72. This is because " '[i]t would be absurd to upset a verdict upon a speculation that the jury did not do their duty and follow the instructions of the court.' " *Id.* (quoting *Graham v. United States,* 231 U.S. 474, 481, 34 S.Ct. 148, 58 L.Ed. 319 (1913)).

 At least three of the *Peyton* factors weigh in Coleman's favor. The polygraph reference was solicited by the prosecutor, and the jury's determination of guilt was solely a function of assessing the credibility of the witnesses, *i.e.,* determining whether Coleman's version of the events raised a reasonable doubt in light of the testimony of the other witnesses, including Dante Scott. In addition, the jury could have inferred that results of the polygraph

corroborated Dante's testimony at trial because the reference to the polygraph test was elicited by the prosecutor on direct examination, implying that the test had been administered as part of the deal Dante had with the government—and the jury likely assumed that the government would be unwilling to accept a deal if Dante had, in fact, failed the polygraph.

 Even though the reference to the polygraph test was improper and should not have been made, we conclude that the trial judge did not abuse its discretion in denying the motion for a mistrial in light of the trial judge's immediate instruction, the fact that the reference to the polygraph was a "single, isolated statement," *id.* at 70, and the strength of the government's case against Coleman. Notwithstanding the substantial impeachment of the testimony of Dante and Samuel, who both testified that they saw Coleman shoot the victims, Coleman himself confessed to the murders on four separate occasions: twice to Andre, once to Shariati, and again when he was interviewed by AUSA Rosen. Thus, even if the jury completely discredited the eyewitness accounts, his own repeated confessions to different persons with whom he had different relationships, constituted overwhelming evidence of guilt. The single reference to the polygraph,

which was immediately cured by the trial judge's instruction, is unlikely to have affected the verdict in light of the overwhelming evidence of Coleman's guilt.[20]

### 3. The Government's Vouching for the Credibility of Government Witnesses

During rebuttal argument, the prosecutor commented:

> Finally, with respect to Mr. Coleman. You saw him get up on the stand the other day and talk about the fact that he was innocent. Well, ladies and gentlemen, would you really expect him to get up there on the stand and tell you that he did it? That might happen in television and the movies but this is the real world.... And you know, ladies and gentlemen, that he did it because why would the police; the government, Ms. Motz [AUSA], myself, Mr. Rosen who you saw; the detectives, one of whom you've seen and others you've heard about, why would they spend four years of their lives investigating the wrong person.... Why would the police go after an innocent man and let the real killer go free? It makes no sense.

Defense counsel objected and moved for a mistrial. The trial judge denied the mo-

---

**20.** For the first time on appeal, Coleman argues that during AUSA Rosen's direct examination, he improperly gave his opinion as to Coleman's veracity, primarily through his description of Coleman's demeanor during the interview, that Coleman "seemed to be very sincere" when he was confessing. Coleman also argues that it was improper for AUSA Rosen to testify regarding their conversation about Coleman's "religious artifact" during the interview. AUSA Rosen told the jury that the two had been discussing the meaning of the artifact and the importance of religion immediately before Coleman confessed to the murders.

Because Coleman did not object to any of these comments at trial, we review only for

plain error. *See Olano,* 507 U.S. at 732, 113 S.Ct. 1770. Even assuming it was error to permit AUSA Rosen to describe the conversation leading up to Coleman's confession and to state his opinion that Coleman's confession was "sincere" based on his demeanor during the interview, appellant cannot demonstrate that the error affected his substantial rights or resulted in manifest injustice. As discussed in the text, the case against Coleman was very strong, and even disregarding AUSA Rosen's testimony entirely, the jury was still made aware—through Coleman's own testimony— that he had confessed to the murders during the interview with AUSA Rosen. We, therefore, reject Coleman's argument that AUSA Rosen's comments warrant a new trial.

tion for a mistrial, but immediately instructed the jury that "any argument about what the police or prosecutors thought or did is not relevant . . . . and you should disregard any statement about what any policeman, lawyer, or anybody else might have thought in the course of the investigation." During final jury instructions, the trial judge repeated the instruction, stating that "if you think a lawyer has expressed a personal belief or opinion during argument, disregard it and judge this case based only on the evidence."

■■■■ "In reviewing alleged impropriety in the prosecutor's closing argument, we first consider whether the challenged comments were improper." *Bates v. United States,* 766 A.2d 500, 508 (D.C. 2000). We have no hesitation in concluding that the quoted portion of the prosecution's rebuttal argument vouching for the government's witnesses and the prosecution generally was highly improper.[21] We have repeatedly admonished prosecutors against commenting on the veracity of government witnesses during rebuttal argument. *See Powell v. United States,* 455 A.2d 405, 408 (D.C.1982). In cases such as this one, where the determination of guilt rests on the jury's assessment of the credibility of the witnesses, improperly vouching for the credibility of witnesses is of "cardinal importance." *Id.* We also recognize that the prejudicial effect of such comments are heightened when presented in rebuttal argument. *See Hartridge v. United States,* 896 A.2d 198, 221 (D.C. 2006). In a few sentences, as the trial court recognized, the prosecutor managed to breach this important stricture and vouched for the credibility of every single government employee associated with the case, including AUSA Rosen, who testified as a fact witness, the detectives who investigated the case, and herself, who presented the government's case to the jury.

■■■■ Given that the prosecutor's comments were improper, "we must, viewing the remarks in context, consider the gravity of the impropriety, its relationship to the issue of guilt, the effect of any corrective action by the trial judge, and the strength of the government's case." *Bates,* 766 A.2d at 508 (quotation marks and citation omitted). The trial judge twice instructed the jury that the prosecutor was prohibited from expressing her personal opinion as to the veracity of the witnesses. There is no reason on the record why we should not apply the presumption that the jury followed those instructions. *See Plater v. United States,* 745 A.2d 953, 959 (D.C.2000) (citing *Wright v. United States,* 637 A.2d 95, 97 (D.C.1994)).

In addition, as discussed above, the government's evidence of Coleman's guilt was overwhelming. In addition to the eyewitnesses who testified that they saw him shoot the victims, others (including his girlfriend) testified that Coleman confessed to the murders on several occasions. And, during his own direct examination, Coleman admitted that he confessed to the detectives and AUSA Rosen. In light of the strength of the government's case and the curative instruction, we are satisfied that the trial court did not abuse its discretion in denying the motion for a mistrial.[22]

---

21. On appeal, the government concedes that the comments were improper.

22. Because we conclude that the improper vouching argument was harmless in light of the judge's instructions and the strength of the government's case, we need not decide

(although the government does not argue the point) the propriety of the prosecutor's other comment in rebuttal that is challenged by appellant, that the jury should not have expected that appellant would take the stand and "tell you that he did it. That might happen in television and the movies, but this

We, therefore, affirm Coleman's convictions.

## II. Quincy M. Jones (No. 04–CF–772)

Of the arguments Jones raises on appeal, we see no reason to reverse based on the trial judge's instructing the jury on second-degree murder as a lesser-included offense of first-degree premeditated murder, or on the ground of insufficiency of the evidence to sustain his convictions for murder and PFCV. We agree, however, that the trial judge erroneously instructed the jury as to the intent required to sustain a conviction on a theory of aiding and abetting murder. We, therefore, vacate his convictions for second-degree murder and the related PFCV conviction, and remand for a new trial.[23]

### A. Insufficiency of the Evidence

■■■■ Jones argues that there was insufficient evidence presented at trial to convict him of second-degree murder and PFCV as an aider and abettor.[24] We disagree.

When this court considers a claim of evidentiary insufficiency, it must view the evidence in the light most favorable to the government, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact. We do not distinguish between direct and circumstantial evidence, and the government is not required to negate every possible inference of innocence. Rather, it is only where the government has produced no evidence from which a reasonable mind might fairly infer guilt beyond a reasonable doubt that this court can reverse a conviction.

*Freeman v. United States,* 912 A.2d 1213, 1218–19 (D.C.2006) (quotation marks and citations omitted).

■■■ Second-degree murder is a killing done with either specific intent to kill or inflict serious bodily harm, or a conscious disregard of the risk of death or serious bodily injury. *See Comber v. United States,* 584 A.2d 26, 38–39 (D.C.1990). To convict of PFCV, the government must prove that a person possessed a firearm during a "crime of violence," which includes second-degree murder. D.C.Code § 22–4504(b) (2001).

■■■ Thomas testified that Jones confessed to him that he was in the parking lot with Coleman and Kevin. According to Thomas, when Kevin asked Jones "what you going to do about this here?" Jones responded, "fuck 'em.'" Viewed in the light most favorable to the government, a jury could have understood that Jones was

---

is the real world." That assessment would depend on whether the prosecutor was permissibly commenting on the evidence presented, *see Irick v. United States,* 565 A.2d 26, 35 (D.C.1989) ("Characterization of defense testimony as incredible is permissible . . . when it is a logical inference from the evidence, and not merely the prosecutor's personal opinion as to appellant's veracity." (quotation marks and citation omitted)), or impermissibly disparaging the defendant's testimony, *see Powell,* 455 A.2d at 409 (reversing for substantial prejudice after disapproving of several of the prosecutor's comments, including, "Are you going to believe a man who has a stake in the outcome? Are you going to believe him?

Even his own lawyer doesn't talk about that.").

23. Because we are remanding for a new trial, we need not address Jones's claim that the trial court erred in denying his motion to sever his and Coleman's trial. His brief on appeal does not argue that his conviction for CDW with respect to the rifle used by Coleman was the result of improper joinder. Jones was acquitted of PFCV and CDW with respect to the shotgun used by Bowman.

24. We discuss *infra* the erroneous instruction given on the *mens rea* required for aiding and abetting liability.

giving a direct order to shoot the young men who had been trying to break into his car. That statement, when viewed in the context of Jones having just given a machine gun to Coleman, sufficed to permit a reasonable jury to infer that Jones specifically intended for Coleman and Kevin to shoot the victims, or—at least—that he acted with conscious disregard of the risk that they would do so. On this evidence, a jury could convict Jones for second-degree murder and PFCV as an aider and abettor. *See Tyree v. United States*, 942 A.2d 629, 636 (D.C.2008) (noting that to prove aiding and abetting, the government must show that "(a) a crime was committed by someone; (b) the accused assisted or participated in its commission; and (c) his participation was with guilty knowledge." (quoting *Hawthorne v. United States*, 829 A.2d 948, 952 (D.C.2003))).

*B. Second–Degree Murder Instruction*

We also disagree that the trial judge erred in instructing the jury on second-degree murder as a lesser-included offense of first-degree premeditated murder.

 "A lesser-included offense instruction is proper where (1) the lesser included offense consists of some, but not every element of the greater offense; and (2) the evidence is sufficient to support the lesser charge." *Leak v. United States*, 757 A.2d 739, 740 (D.C.2000) (quotation marks and citation omitted).

> This evidentiary requirement can be met in one of two ways: (1) where there is conflicting testimony on the factual issue, and (2) where the lesser included offense is fairly inferable from the evidence including a reconstruction of the events gained by accepting testimony of some or all of the witnesses even in part.

*Id.*(citation omitted). "This requirement is a minimal one; it means any evidence ... however weak." *Shuler v. United States*,

677 A.2d 1014, 1017 (D.C.1996) (internal quotation marks and citation omitted). "That is to say, the weight of the evidence supporting the instruction is immaterial; as long as a jury could rationally convict on the lesser-included offense after crediting the evidence, the court must give the instruction no matter how inclined it might be to discount that evidence." *Id.*

 Jones argues that there was no evidentiary basis for the second-degree murder instruction because it was "[t]he government's theory ... that the decedents were killed in a cold-blooded, deliberate revenge killing for having broken into Mr. Jones's car." *See Gardner v. United States*, 898 A.2d 367, 375 n. 20 (D.C.2006) (noting that first-degree murder requires "deliberate and premeditated malice," while second-degree murder does not (quoting D.C.Code § 22–2101)).

A rational juror, however, could have concluded that Jones did not intend to kill the victims when he retrieved the gun and gave it to Coleman, but instead formed the intent to kill immediately after Jones patted down the victims' pockets prior to saying "fuck 'em.'" In between the time he gave the gun to Coleman and this statement, a reasonable juror could have concluded, Jones was angered by the fact that the amount of money the victims had would not adequately compensate for the broken car window, and decided to retaliate. It is also possible that the jury would think that when Kevin asked Jones "what you going to do about this here, he tried to carry you and so what you going to do?," Jones took it as a challenge to his "street-credibility." Based on these inferences, it is therefore possible that the jury could have thought that Jones formed the intent to kill at the last moment, because he was provoked by either circumstance. Accordingly, we conclude that the court did not

err in instructing the jury on second-degree murder.[25]

### C. Aiding and Abetting Instruction

It was the government's theory at trial that Jones should be convicted for murder (first or second-degree) as an aider and abettor. During closing argument, the prosecutor told the jury that

> Quincy Jones did not pull the trigger and nobody has ever said that he did. But Quincy Jones, under the law, is just as guilty of the first degree murder while armed of these boys because of the law called aiding and abetting.
>
> . . . .
>
> . . . . It is not necessary that Mr. Jones have had the same intent as Mr. Coleman or Mr. Bowman when the crime was committed or that he have intended to commit the particular crimes committed by Mr. Coleman and Mr. Bowman. Mr. Jones is *legally responsible for the acts of other persons that are natural and probable consequences of the crime in which he intentionally participates.*

In rebuttal argument, the prosecutor went further, telling the jury that it could "find Mr. Jones guilty even if you find all he did was bring a gun to the scene." The same message was conveyed in final jury instructions:

> It is not necessary that the defendant have had the same intent that the principal offender had when the crime was committed or that he intended to commit the particular crime committed by the principal offender.
>
> *An aider and abettor is legally responsible for the acts of other persons that are the natural and probable consequences of the crime in which he intentionally participates.*

Defense counsel objected to the inclusion of the italicized language.

 In *Wilson–Bey v. United States*, 903 A.2d 818 (D.C.2006) (en banc), decided after this case was tried, this court held that predicating guilt as aider and abettor on the "natural and probable consequences" of a defendant's actions could not be reconciled with the requirement that "each participant's responsibility in a criminal homicide must turn on his or her individual intent or *mens rea.*" *Id.* at 836. Indeed, "where a specific *mens rea* is an element of a criminal offense, a defendant must have had that *mens rea* himself to be guilty of that offense." *Kitt v. United States*, 904 A.2d 348, 356 (D.C.2006). The government concedes that the instruction in this case was erroneous, but argues that the error was harmless beyond a reasonable doubt under *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). *See Wilson–Bey*, 903 A.2d at 843–47 (applying *Chapman* standard where jury erroneously instructed that it may convict based on a "natural and probable consequences" theory).

 The fact that the jury convicted Jones of the lesser-included second-degree murder charge does not obviate the need to analyze harmlessness because sec-

---

**25.** For the first time on appeal, appellant also argues that the trial court improperly "changed the language of paragraph two of the approved [second-degree murder] instruction from 'specific intent to kill or seriously injure the decedent' to 'intended to kill or seriously injure the decedent.'" In doing so, the trial judge appears to have inadvertently misstated the standard Redbook instruction which states that the defendant must have the "specific intent to kill." *See* Criminal Jury Instructions for the District of Columbia, No. 4.17B (4th ed.1993). Because we are vacating Jones's conviction for second-degree murder on another ground, we need not decide whether the instruction the trial judge gave was erroneous.

ond-degree murder is a "specific intent crime." *See Williams v. United States,* 881 A.2d 557, 566 (D.C.2005); *see generally Comber,* 584 A.2d at 42. Although conviction for second-degree murder does not necessarily require proof of an "intent to kill," and may be based on proof of a "conscious disregard of an extreme risk of death or serious bodily injury," *Comber,* 584 A.2d at 38, 43 n. 19, a conviction for second-degree murder cannot stand on the basis that the defendant was merely negligent. As we made clear in *Wilson–Bey,* "a 'natural and probable consequences' rule imposes liability on an accomplice for the crime committed by the principal on the basis of the accomplice's negligence." 903 A.2d at 836 (citations omitted). Accordingly, we must examine the likelihood that the jury convicted Jones of second-degree murder without finding that he had the requisite *mens rea.*

■ In order for this court to uphold the judgment of conviction, the government bears the burden of proving beyond a reasonable doubt that the erroneous instruction was harmless. *See Benn v. United States,* 801 A.2d 132, 144 (D.C. 2002) (citing *Chapman* ). "[W]e must find it *highly probable* that [the] error did not contribute to the verdict." *Wilson–Bey,* 903 A.2d at 844 (internal quotation marks and citations omitted). In our view, given the evidence in the case the government cannot meet this heavy burden.

There were three witnesses who testified to Jones's involvement in the murders: Samuel Bowman, Dante Scott and Walter Thomas. Because the jury convicted Jones, it must have credited the testimony of at least one of these witnesses that Jones was, in fact, present in the parking lot that evening when Coleman and Kevin Bowman shot the victims. Assuming the jury credited Samuel's and Dante's eyewitness testimony with respect to Jones's participation, the jury believed that Jones retrieved a machine gun and gave it to Coleman. Neither of these witnesses, however, testified that they heard Jones order Coleman or Kevin to shoot. We think there is a reasonable possibility, therefore, that the jury convicted Jones based solely on the premise—which the prosecutor urged on rebuttal—that when Jones handed Coleman the machine gun, the "natural and probable consequence" of that action was that Coleman would shoot the victims.

It was Thomas who testified that Jones confided to him in jail that he said "fuck 'em.'" That testimony does not ease our concern that the jury might have convicted based on the "natural and probable consequences" theory. Thomas's testimony was substantially impeached, *see* note 12, *supra,* and there is a reasonable possibility that the jury disregarded it in its entirety. Even assuming, however, that the jury credited his testimony, Thomas did not testify unequivocally that Jones confessed to him that he intended that the victims be shot. Instead, Thomas testified that Jones told him that while Coleman and Kevin were holding the victims at gunpoint, Jones said "fuck 'em'" in response to Kevin asking "what [you] going to do?". While the jury *may* have concluded that "fuck 'em'" was an execution order, *i.e.,* "kill them"—such that Jones had the intent to kill and the conviction would stand—the jury also could have interpreted the comment as indicating a desire not to kill the victims, *i.e.,* "never mind," or a disinterested "I don't care." The latter interpretations would find some support in Dante Scott's testimony that immediately after the shootings, he gave a ride to Jones who appeared "shook up." Thus, even if the jury credited Thomas's testimony as to what Jones said after he patted down the victims looking for cash, there is still a

reasonable possibility that it might have convicted Jones merely because he gave Coleman a gun, as urged by the prosecutor in rebuttal.[26]

We therefore conclude that the government has not established beyond a reasonable doubt that the aiding and abetting erroneous instruction did not contribute to Jones's guilty verdict. We vacate Jones's convictions for second-degree murder and PFCV,[27] and remand the case for a new trial on those charges. The CDW conviction is affirmed.[28]

We affirm Coleman's convictions.

*So ordered.*

---

26. As discussed previously, this is not to say that if the same evidence is presented at a new trial it would be insufficient to convict of second-degree murder, if the jury interpreted Jones's actions of giving Coleman the machine gun and words ("fuck 'em' ") as conscious disregard for the risk that Coleman would take matters in his own hands and shoot in light of his previous comment.

27. "The elements of PFCV are (1) possession of a firearm or imitation firearm (2) while committing a crime of violence or a dangerous crime (as defined in another statute)." *Ray v. United States,* 620 A.2d 860, 864–65 (D.C.1993). Because we are vacating the conviction for second-degree murder—the "crime of violence" on which the PFCV conviction was based—the second element of PFCV is not met as a matter of law.

28. The trial judge imposed a sentence of twenty months to five years on the CDW conviction, to be served concurrently with the sentences for the two counts of murder (ten to thirty years, with ten years minimum, to be served consecutively) and five to fifteen years for PFCV, to be served concurrently. On remand, the trial judge may adjust the CDW sentence as appropriate.